# LECHMERE, INC. *v.* NATIONAL LABOR RELATIONS BOARD

No. 90–970.   Argued November 12, 1991—Decided January 27, 1992

THOMAS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, KENNEDY, and SOUTER, JJ., joined. WHITE, J., filed a dissenting opinion, in which BLACKMUN, J., joined, *post*, p. 541. STEVENS, J., filed a dissenting opinion, *post*, p. 548.

*Robert P. Joy* argued the cause for petitioner. With him on the briefs were *Keith H. McCown* and *Benjamin Smith.*

*Michael R. Dreeben* argued the cause for respondent. With him on the brief were *Solicitor General Starr, Acting Deputy Solicitor General Wright, Norton J. Come,* and *Linda Sher.**

---

*Briefs of *amici curiae* urging reversal were filed for the Chamber of Commerce of the United States of America et al. by *John S. Irving, Stephen A. Bokat,* and *Robert J. Verdisco;* for the Council on Labor Law Equality by *Gerard C. Smetana* and *Michael E. Avakian;* for the Food Marketing Institute by *Eugene D. Ulterino;* for the International Council of Shopping Centers, Inc., by *Stephanie McEvily* and *Edward J. Sack;* and for the National Retail Federation by *John W. Noble, Jr.,* and *Edward B. Miller.*

*J. William Gagne, George R. Murphy, Peter J. Ford, David Silberman,* and *Laurence Gold* filed a brief for the American Federation of Labor

JUSTICE THOMAS delivered the opinion of the Court.

This case requires us to clarify the relationship between the rights of employees under § 7 of the National Labor Relations Act (NLRA or Act), 49 Stat. 452, as amended, 29 U. S. C. § 157, and the property rights of their employers.

I

This case stems from the efforts of Local 919 of the United Food and Commercial Workers Union, AFL–CIO, to organize employees at a retail store in Newington, Connecticut, owned and operated by petitioner Lechmere, Inc. . The store is located in the Lechmere Shopping Plaza, which occupies a roughly rectangular tract measuring approximately 880 feet from north to south and 740 feet from east to west. Lechmere's store is situated at the Plaza's south end, with the main parking lot to its north. A strip of 13 smaller "satellite stores" not owned by Lechmere runs along the west side of the Plaza, facing the parking lot. To the Plaza's east (where the main entrance is located) runs the Berlin Turnpike, a four-lane divided highway. The parking lot, however, does not abut the Turnpike; they are separated by a 46-foot-wide grassy strip, broken only by the Plaza's entrance. The parking lot is owned jointly by Lechmere and the developer of the satellite stores. The grassy strip is public property (except for a 4-foot-wide band adjoining the parking lot, which belongs to Lechmere).

The union began its campaign to organize the store's 200 employees, none of whom was represented by a union, in June 1987. After a full-page advertisement in a local newspaper drew little response, nonemployee union organizers entered Lechmere's parking lot and began placing handbills on the windshields of cars parked in a corner of the lot used mostly by employees. Lechmere's manager immediately

and Congress of Industrial Organizations et al. as *amici curiae* urging affirmance.

confronted the organizers, informed them that Lechmere prohibited solicitation or handbill distribution of any kind on its property,[1] and asked them to leave.  They did so, and Lechmere personnel removed the handbills.  The union organizers renewed this handbilling effort in the parking lot on several subsequent occasions; each time they were asked to leave and the handbills were removed.  The organizers then relocated to the public grassy strip, from where they attempted to pass out handbills to cars entering the lot during hours (before opening and after closing) when the drivers were assumed to be primarily store employees.  For one month, the union organizers returned daily to the grassy strip to picket Lechmere; after that, they picketed intermittently for another six months.  They also recorded the license plate numbers of cars parked in the employee parking area; with the cooperation of the Connecticut Department of Motor Vehicles, they thus secured the names and addresses of some 41 nonsupervisory employees (roughly 20% of the store's total).  The union sent four mailings to these employees; it also made some attempts to contact them by phone or home visits.  These mailings and visits resulted in one signed union authorization card.

---

[1] Lechmere had established this policy several years prior to the union's organizing efforts.  The store's official policy statement provided, in relevant part:

"Non-associates [i. e., nonemployees] are prohibited from soliciting and distributing literature at all times anywhere on Company property, including parking lots.  Non-associates have no right of access to the non-working areas and only to the public and selling areas of the store in connection with its public use."  Brief for Petitioner 7.

On each door to the store Lechmere had posted a 6- by 8-inch sign reading: "TO THE PUBLIC.  No Soliciting, Canvassing, Distribution of Literature or Trespassing by Non-Employees in or on Premises."  App. 115–116.  Lechmere consistently enforced this policy inside the store as well as on the parking lot (against, among others, the Salvation Army and the Girl Scouts).

Alleging that Lechmere had violated the NLRA by barring the nonemployee organizers from its property, the union filed an unfair labor practice charge with respondent National Labor Relations Board (Board). Applying the criteria set forth by the Board in *Fairmont Hotel Co.*, 282 N. L. R. B. 139 (1986), an Administrative Law Judge (ALJ) ruled in the union's favor. *Lechmere, Inc.*, 295 N. L. R. B. 94 (1988). He recommended that Lechmere be ordered, among other things, to cease and desist from barring the union organizers from the parking lot and to post in conspicuous places in the store signs proclaiming in part:

> "WE WILL NOT prohibit representatives of Local 919, United Food and Commercial Workers, AFL-CIO ('the Union') or any other labor organization, from distributing union literature to our employees in the parking lot adjacent to our store in Newington, Connecticut, nor will we attempt to cause them to be removed from our parking lot for attempting to do so." *Ibid.*

The Board affirmed the ALJ's judgment and adopted the recommended order, applying the analysis set forth in its opinion in *Jean Country*, 291 N. L. R. B. 11 (1988), which had by then replaced the short-lived *Fairmont Hotel* approach. 295 N. L. R. B. 92 (1989). A divided panel of the United States Court of Appeals for the First Circuit denied Lechmere's petition for review and enforced the Board's order. 914 F. 2d 313 (1990). This Court granted certiorari, 499 U. S. 918 (1991).

II

A

Section 7 of the NLRA provides in relevant part that "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations." 29 U. S. C. § 157. Section 8(a)(1) of the Act, in turn, makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in

[§ 7]." 29 U. S. C. § 158(a)(1). By its plain terms, thus, the NLRA confers rights only on *employees*, not on unions or their nonemployee organizers. In *NLRB* v. *Babcock & Wilcox Co.*, 351 U. S. 105 (1956), however, we recognized that insofar as the employees' "right of self-organization depends in some measure on [their] ability . . . to learn the advantages of self-organization from others," *id.*, at 113, § 7 of the NLRA may, in certain limited circumstances, restrict an employer's right to exclude nonemployee union organizers from his property. It is the nature of those circumstances that we explore today.

*Babcock* arose out of union attempts to organize employees at a factory located on an isolated 100-acre tract. The company had a policy against solicitation and distribution of literature on its property, which it enforced against all groups. About 40% of the company's employees lived in a town of some 21,000 persons near the factory; the remainder were scattered over a 30-mile radius. Almost all employees drove to work in private cars and parked in a company lot that adjoined the fenced-in plant area. The parking lot could be reached only by a 100-yard-long driveway connecting it to a public highway. This driveway was mostly on company-owned land, except where it crossed a 31-foot-wide public right-of-way adjoining the highway. Union organizers attempted to distribute literature from this right-of-way. The union also secured the names and addresses of some 100 employees (20% of the total) and sent them three mailings. Still other employees were contacted by telephone or home visit.

The union successfully challenged the company's refusal to allow nonemployee organizers onto its property before the Board. While acknowledging that there were alternative, nontrespassory means whereby the union could communicate with employees, the Board held that contact at the workplace was preferable. *The Babcock & Wilcox Co.*, 109 N. L. R. B. 485, 493–494 (1954). "[T]he right to distribute is not ab-

solute, but must be accommodated to the circumstances. Where it is impossible or unreasonably difficult for a union to distribute organizational literature to employees entirely off of the employer's premises, distribution on a nonworking area, such as the parking lot and the walkways between the parking lot and the gate, may be warranted." *Id.*, at 493. Concluding that traffic on the highway made it unsafe for the union organizers to distribute leaflets from the right-of-way and that contacts through the mails, on the streets, at employees' homes, and over the telephone would be ineffective, the Board ordered the company to allow the organizers to distribute literature on the company's parking lot and exterior walkways. *Id.*, at 486–487.

The Court of Appeals for the Fifth Circuit refused to enforce the Board's order, *NLRB* v. *Babcock & Wilcox Co.*, 222 F. 2d 316 (1955), and this Court affirmed. While recognizing that "the Board has the responsibility of 'applying the Act's general prohibitory language in the light of the infinite combinations of events which might be charged as violative of its terms,'" 351 U. S., at 111–112 (quoting *NLRB* v. *Stowe Spinning Co.*, 336 U. S. 226, 231 (1949)), we explained that the Board had erred by failing to make the critical distinction between the organizing activities of employees (to whom §7 guarantees the right of self-organization) and nonemployees (to whom §7 applies only derivatively). Thus, while "[n]o restriction may be placed on the employees' right to discuss self-organization *among themselves*, unless the employer can demonstrate that a restriction is necessary to maintain production or discipline," 351 U. S., at 113 (emphasis added) (citing *Republic Aviation Corp.* v. *NLRB*, 324 U. S. 793, 803 (1945)), "no such obligation is owed nonemployee organizers," 351 U. S., at 113. As a rule, then, an employer cannot be compelled to allow distribution of union literature by nonemployee organizers on his property. As with many other rules, however, we recognized an exception. Where "the location of a plant and the living quarters of the

employees place the employees beyond the reach of reasonable union efforts to communicate with them," *ibid.*, employers' property rights may be "required to yield to the extent needed to permit communication of information on the right to organize," *id.*, at 112.

Although we have not had occasion to apply *Babcock*'s analysis in the ensuing decades, we have described it in cases arising in related contexts. Two such cases, *Central Hardware Co.* v. *NLRB*, 407 U. S. 539 (1972), and *Hudgens* v. *NLRB*, 424 U. S. 507 (1976), involved activity by union supporters on employer-owned property. The principal issue in both cases was whether, based upon *Food Employees* v. *Logan Valley Plaza, Inc.*, 391 U. S. 308 (1968), the First Amendment protected such activities. In both cases we rejected the First Amendment claims, and in *Hudgens* we made it clear that *Logan Valley* was overruled. Having decided the cases on constitutional grounds, we remanded them to the Board for consideration of the union supporters' § 7 claims under *Babcock*. In both cases, we quoted approvingly *Babcock*'s admonition that accommodation between employees' § 7 rights and employers' property rights "must be obtained with as little destruction of one as is consistent with the maintenance of the other," 351 U. S., at 112. See *Central Hardware, supra,* at 544; *Hudgens, supra,* at 521, 522. There is no hint in *Hudgens* and *Central Hardware,* however, that our invocation of *Babcock*'s language of "accommodation" was intended to repudiate or modify *Babcock*'s holding that an employer need not accommodate nonemployee organizers unless the employees are otherwise inaccessible. Indeed, in *Central Hardware* we expressly noted that nonemployee organizers cannot claim even a limited right of access to a nonconsenting employer's property until "[a]fter the requisite need for access to the employer's property has been shown." 407 U. S., at 545.

If there was any question whether *Central Hardware* and *Hudgens* changed § 7 law, it should have been laid to rest by

*Sears, Roebuck & Co.* v. *Carpenters,* 436 U. S. 180 (1978). As in *Central Hardware* and *Hudgens,* the substantive § 7 issue in *Sears* was a subsidiary one; the case's primary focus was on the circumstances under which the NLRA pre-empts state law. Among other things, we held in *Sears* that arguable § 7 claims do not pre-empt state trespass law, in large part because the trespasses of nonemployee union organizers are "far more likely to be unprotected than protected," 436 U. S., at 205; permitting state courts to evaluate such claims, therefore, does not "create an unacceptable risk of interference with conduct which the Board, and a court reviewing the Board's decision, would find protected," *ibid.* This holding was based upon the following interpretation of *Babcock:*

> "While *Babcock* indicates that an employer may not always bar nonemployee union organizers from his property, his right to do so remains the general rule. To gain access, *the union has the burden of showing that no other reasonable means of communicating its organizational message to the employees exists* or that the employer's access rules discriminate against union solicitation. That the burden imposed on the union is a heavy one is evidenced by the fact that the balance struck by the Board and the courts under the *Babcock* accommodation principle has rarely been in favor of trespassory organizational activity." 436 U. S., at 205 (emphasis added; footnotes omitted).

We further noted that, in practice, nonemployee organizational trespassing had generally been prohibited except where "unique obstacles" prevented nontrespassory methods of communication with the employees. *Id.,* at 205–206, n. 41.

B

*Jean Country,* as noted above, represents the Board's latest attempt to implement the rights guaranteed by § 7. It sets forth a three-factor balancing test:

"[I]n all access cases our essential concern will be [1] the degree of impairment of the Section 7 right if access should be denied, as it balances against [2] the degree of impairment of the private property right if access should be granted. We view the consideration of [3] the availability of reasonably effective alternative means as especially significant in this balancing process." 291 N. L. R. B., at 14.

The Board conceded that this analysis was unlikely to foster certainty and predictability in this corner of the law, but declared that "as with other legal questions involving multiple factors, the 'nature of the problem, as revealed by unfolding variant situations, inevitably involves an evolutionary process for its rational response, not a quick, definitive formula as a comprehensive answer.'" *Ibid.* (quoting *Electrical Workers* v. *NLRB,* 366 U. S. 667, 674 (1961)).

Citing its role "as the agency with responsibility for implementing national labor policy," the Board maintains in this case that *Jean Country* is a reasonable interpretation of the NLRA entitled to judicial deference. Brief for Respondent 18, and n. 8; Tr. of Oral Arg. 22. It is certainly true, and we have long recognized, that the Board has the "special function of applying the general provisions of the Act to the complexities of industrial life." *NLRB* v. *Erie Resistor Corp.,* 373 U. S. 221, 236 (1963); see also *Phelps Dodge Corp.* v. *NLRB,* 313 U. S. 177, 196–197 (1941). Like other administrative agencies, the NLRB is entitled to judicial deference when it interprets an ambiguous provision of a statute that it administers. See, *e. g., NLRB* v. *Food & Commercial Workers,* 484 U. S. 112, 123 (1987); cf. *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837, 842–843 (1984).

Before we reach any issue of deference to the Board, however, we must first determine whether *Jean Country*—at least as applied to nonemployee organizational trespassing—is consistent with our past interpretation of § 7. "Once we

have determined a statute's clear meaning, we adhere to that determination under the doctrine of *stare decisis*, and we judge an agency's later interpretation of the statute against our prior determination of the statute's meaning." *Maislin Industries, U. S., Inc.* v. *Primary Steel, Inc.*, 497 U. S. 116, 131 (1990).

In *Babcock*, as explained above, we held that the Act drew a distinction "of substance," 351 U. S., at 113, between the union activities of employees and nonemployees. In cases involving *employee* activities, we noted with approval, the Board "balanced the conflicting interests of employees to receive information on self-organization on the company's property from fellow employees during nonworking time, with the employer's right to control the use of his property." *Id.*, at 109–110. In cases involving *nonemployee* activities (like those at issue in *Babcock* itself), however, the Board was not permitted to engage in that same balancing (and we reversed the Board for having done so). By reversing the Board's interpretation of the statute for failing to distinguish between the organizing activities of employees and nonemployees, we were saying, in *Chevron* terms, that § 7 speaks to the issue of nonemployee access to an employer's property. *Babcock*'s teaching is straightforward: § 7 simply does not protect nonemployee union organizers *except* in the rare case where "the inaccessibility of employees makes ineffective the reasonable attempts by nonemployees to communicate with them through the usual channels," 351 U. S., at 112. Our reference to "reasonable" attempts was nothing more than a commonsense recognition that unions need not engage in extraordinary feats to communicate with inaccessible employees—*not* an endorsement of the view (which we expressly rejected) that the Act protects "reasonable" trespasses. Where reasonable alternative means of access exist, § 7's guarantees do not authorize trespasses by nonemployee organizers, *even* (as we noted in *Babcock, ibid.*) "under . . . reasonable regulations" established by the Board.

*Jean Country,* which applies broadly to "all access cases," 291 N. L. R. B., at 14, misapprehends this critical point. Its principal inspiration derives not from *Babcock,* but from the following sentence in *Hudgens:* "[T]he locus of th[e] accommodation [between § 7 rights and private property rights] may fall at differing points along the spectrum depending on the nature and strength of the respective § 7 rights and private property rights asserted in any given context." 424 U. S., at 522. From this sentence the Board concluded that it was appropriate to approach every case by balancing § 7 rights against property rights, with alternative means of access thrown in as nothing more than an "especially significant" consideration. As explained above, however, *Hudgens* did not purport to modify *Babcock,* much less to alter it fundamentally in the way *Jean Country* suggests. To say that our cases require accommodation between employees' and employers' rights is a true but incomplete statement, for the cases also go far in establishing the *locus* of that accommodation where nonemployee organizing is at issue. So long as nonemployee union organizers have reasonable access to employees outside an employer's property, the requisite accommodation has taken place. It is *only* where such access is infeasible that it becomes necessary and proper to take the accommodation inquiry to a second level, balancing the employees' and employers' rights as described in the *Hudgens* dictum. See *Sears,* 436 U. S., at 205; *Central Hardware,* 407 U. S., at 545. At least as applied to nonemployees, *Jean Country* impermissibly conflates these two stages of the inquiry—thereby significantly eroding *Babcock*'s general rule that "an employer may validly post his property against nonemployee distribution of union literature," 351 U. S., at 112. We reaffirm that general rule today, and reject the Board's attempt to recast it as a multifactor balancing test.

## C

The threshold inquiry in this case, then, is whether the facts here justify application of *Babcock*'s inaccessibility exception. The ALJ below observed that "the facts herein convince me that reasonable alternative means [of communicating with Lechmere's employees] *were* available to the Union," 295 N. L. R. B., at 99 (emphasis added).[2]  Reviewing the ALJ's decision under *Jean Country*, however, the Board reached a different conclusion on this point, asserting that "there was no reasonable, effective alternative means available for the Union to communicate its message to [Lechmere's] employees." *Id.*, at 93.

We cannot accept the Board's conclusion, because it "rest[s] on erroneous legal foundations," *Babcock*, *supra*, at 112; see also *NLRB* v. *Brown*, 380 U. S. 278, 290–292 (1965).  As we have explained, the exception to *Babcock*'s rule is a narrow one.  It does not apply wherever nontrespassory access to employees may be cumbersome or less-than-ideally effective, but only where "the *location of a plant and the living quarters of the employees* place the employees *beyond the reach* of reasonable union efforts to communicate with them," 351 U. S., at 113 (emphasis added).  Classic examples include logging camps, see *NLRB* v. *Lake Superior Lumber Corp.*, 167 F. 2d 147 (CA6 1948); mining camps, see *Alaska Barite Co.*, 197 N. L. R. B. 1023 (1972), enforced mem., 83 LRRM 2992 (CA9), cert. denied, 414 U. S. 1025 (1973); and mountain resort hotels, see *NLRB* v. *S & H Grossinger's Inc.*, 372 F. 2d

---

[2] Under the (pre-*Jean Country*) *Fairmont Hotel* analysis applied by the ALJ, it was only where the employees' § 7 rights and an employer's property rights were deemed "relatively equal in strength," *Fairmont Hotel Co.*, 282 N. L. R. B. 139, 142 (1986), that the adequacy of nontrespassory means of communication became relevant.  Because the ALJ found that the § 7 rights involved here outweighed Lechmere's property rights, he had no need to address the latter issue.  He did so, he explained, only because of the possibility that his evaluation of the relative weights of the rights might not be upheld.  295 N. L. R. B. 94, 99 (1988).

26 (CA2 1967). *Babcock*'s exception was crafted precisely to protect the § 7 rights of those employees who, by virtue of their employment, are isolated from the ordinary flow of information that characterizes our society. The union's burden of establishing such isolation is, as we have explained, "a heavy one," *Sears, supra,* at 205, and one not satisfied by mere conjecture or the expression of doubts concerning the effectiveness of nontrespassory means of communication.

The Board's conclusion in this case that the union had no reasonable means short of trespass to make Lechmere's employees aware of its organizational efforts is based on a misunderstanding of the limited scope of this exception. Because the employees do not reside on Lechmere's property, they are presumptively not "beyond the reach," *Babcock,* 351 U. S., at 113, of the union's message. Although the employees live in a large metropolitan area (Greater Hartford), that fact does not in itself render them "inaccessible" in the sense contemplated by *Babcock.* See *Monogram Models, Inc.,* 192 N. L. R. B. 705, 706 (1971). Their accessibility is suggested by the union's success in contacting a substantial percentage of them directly, via mailings, phone calls, and home visits. Such direct contact, of course, is not a necessary element of "reasonably effective" communication; signs or advertising also may suffice. In this case, the union tried advertising in local newspapers; the Board said that this was not reasonably effective because it was expensive and might not reach the employees. 295 N. L. R. B., at 93. Whatever the merits of that conclusion, other alternative means of communication were readily available. Thus, signs (displayed, for example, from the public grassy strip adjoining Lechmere's parking lot) would have informed the employees about the union's organizational efforts. (Indeed, union organizers picketed the shopping center's main entrance for months as employees came and went every day.) *Access* to employees, not *success* in winning them over, is the critical issue—although success, or lack thereof, may be relevant in determining

whether reasonable access exists. Because the union in this case failed to establish the existence of any "unique obstacles," *Sears*, 436 U. S., at 205–206, n. 41, that frustrated access to Lechmere's employees, the Board erred in concluding that Lechmere committed an unfair labor practice by barring the nonemployee organizers from its property.

The judgment of the First Circuit is therefore reversed, and enforcement of the Board's order is denied.

*It is so ordered.*

JUSTICE WHITE, with whom JUSTICE BLACKMUN joins, dissenting.

"We will uphold a Board rule so long as it is rational and consistent with the Act, . . . even if we would have formulated a different rule had we sat on the Board." *NLRB* v. *Curtin Matheson Scientific, Inc.*, 494 U. S. 775, 787 (1990). The judicial role is narrow: The Board's application of the rule, if supported by substantial evidence on the record as a whole, must be enforced. *Beth Israel Hospital* v. *NLRB*, 437 U. S. 483, 501 (1978).

In *NLRB* v. *Babcock & Wilcox Co.*, 351 U. S. 105, 112 (1956), the Court said that where nonemployee union representatives seek access to the employer's parking lot for the purpose of communicating with employees, the employer's property rights and the organizational rights of employees must be "[a]ccommodat[ed] . . . with as little destruction of one as is consistent with the maintenance of the other." Although it said that it was slow to overturn an administrative decision, the Court disagreed with the balance the Board had struck in granting access to the union because the Board had failed to recognize that access by nonemployees required a different accommodation than where employees are involved. *Id.*, at 112–113. The Court went on to say that "when the inaccessibility of employees makes ineffective the reasonable attempts by nonemployees to communicate with them through the usual channels, the right to exclude from prop-

erty has been required to yield to the extent needed to permit communication of information on the right to organize." *Ibid.* Later the Court said: "The right of self-organization depends in some measure on the ability of employees to learn the advantages of self-organization from others. Consequently, if the location of a plant and the living quarters of the employees place the employees beyond the reach of reasonable union efforts to communicate with them, the employer must allow the union to approach his employees on his property." *Id.*, at 113. The Court went on to hold that no such conditions were shown in the records of the cases before it.

In the case before us, the Court holds that *Babcock* itself stated the correct accommodation between property and organizational rights; it interprets that case as construing §§ 7 and 8(a)(1) of the National Labor Relations Act (NLRA) to contain a general rule forbidding third-party access, subject only to a limited exception where the union demonstrates that the location of the employer's place of business and the living quarters of the employees place the employees beyond the reach of reasonable efforts to communicate with them. The Court refuses to enforce the Board's order in this case, which rested on its prior decision in *Jean Country*, 291 N. L. R. B. 11 (1988), because, in the Court's view, *Jean Country* revealed that the Board misunderstood the basic holding in *Babcock*, as well as the narrowness of the exception to the general rule announced in that case.

For several reasons, the Court errs in this case. First, that *Babcock* stated that inaccessibility would be a reason to grant access does not indicate that there would be no other circumstance that would warrant entry to the employer's parking lot and would satisfy the Court's admonition that accommodation must be made with as little destruction of property rights as is consistent with the right of employees to learn the advantages of self-organization from others. Of course the union must show that its "reasonable efforts,"

without access, will not permit proper communication with employees. But I cannot believe that the Court in *Babcock* intended to confine the reach of such general considerations to the single circumstance that the Court now seizes upon. If the Court in *Babcock* indicated that nonemployee access to a logging camp would be required, it did not say that only in such situations could nonemployee access be permitted. Nor did *Babcock* require the Board to ignore the substantial difference between the entirely private parking lot of a secluded manufacturing plant and a shopping center lot which is open to the public without substantial limitation. Nor indeed did *Babcock* indicate that the Board could not consider the fact that employees' residences are scattered throughout a major metropolitan area; *Babcock* itself relied on the fact that the employees in that case lived in a compact area which made them easily accessible.

Moreover, the Court in *Babcock* recognized that actual communication with nonemployee organizers, not mere notice that an organizing campaign exists, is necessary to vindicate § 7 rights. 351 U. S., at 113. If employees are entitled to learn from others the advantages of self-organization, *ibid.*, it is singularly unpersuasive to suggest that the union has sufficient access for this purpose by being able to hold up signs from a public grassy strip adjacent to the highway leading to the parking lot.

Second, the Court's reading of *Babcock* is not the reading of that case reflected in later opinions of the Court. We have consistently declined to define the principle of *Babcock* as a general rule subject to narrow exceptions, and have instead repeatedly reaffirmed that the standard is a neutral and flexible rule of accommodation. In *Central Hardware Co.* v. *NLRB*, 407 U. S. 539, 544 (1972), we explicitly stated that the "guiding principle" for adjusting conflicts between § 7 rights and property rights enunciated in *Babcock* is that contained in its neutral "accommodation" language. *Hudgens* v. *NLRB*, 424 U. S. 507 (1976), gave this Court the

occasion to provide direct guidance to the Board on this issue. In that case, we emphasized *Babcock*'s necessity-to-accommodate admonition, pointed out the differences between *Babcock* and *Hudgens*, and left the balance to be struck by the Board. "The locus of that accommodation . . . may fall at differing points along the spectrum depending on the nature and strength of the respective § 7 rights and private property rights asserted in any given context. In each generic situation, the primary responsibility for making this accommodation must rest with the Board in the first instance." 424 U. S., at 522. *Hudgens* did not purport to modify *Babcock* and surely indicates that *Babcock* announced a more flexible rule than the narrow, ironclad rule that the Court now extracts from that case. If *Babcock* means what the Court says it means, there is no doubt tension between that case and *Hudgens*. If that is so, *Hudgens*, as the later pronouncement on the question, issued as a directive to the Board, should be controlling.*

---

*In *Sears, Roebuck & Co.* v. *Carpenters*, 436 U. S. 180 (1978), we once again reaffirmed the accommodation language, as refined by *Hudgens*. The language we quoted in text in *Sears* was that of *Hudgens*, not *Babcock*. Thus, notwithstanding the majority's assertion that *Sears* laid to rest any question whether *Hudgens* changed § 7 law, *ante*, at 534–535, *Sears* in fact endorsed the *Hudgens* refinement of the § 7 property rights accommodation analysis, recognizing that the accommodation may fall at differing points, and that the Board should evaluate the nature and strength of property and § 7 rights.

*Sears* was a pre-emption case, and only peripherally involved substantive principles of § 7 accommodation by the Board. Unlike *Hudgens*, in *Sears* we did not remand for ultimate disposition by the Board, but rather remanded to the state court. Thus, we had no occasion in that case, as we did in *Hudgens*, to provide further guidance to the Board in its interpretation of the NLRA (and of *Babcock*, *Hudgens*, and other decisions). Our "general rule" language recounting the rarity of Board decisions allowing access should be taken for what it was, a descriptive recounting of what "experience . . . teaches," *Sears*, *supra*, at 205, about the way that the Board had exercised its authority, and not any prescription from this Court as to the analysis the Board should apply. That analysis had already been cited. 436 U. S., at 204. Contrary to what the majority suggests, *Sears* did not clear up any false ambiguity created by *Hudgens;* to

The majority today asserts that "[i]t is *only* where [reasonable alternative] access is infeasible that it becomes necessary and proper to take the accommodation inquiry to a second level, balancing the employees' and employers' rights." *Ante,* at 538. Our cases, however, are more consistent with the *Jean Country* view that reasonable alternatives are an important factor in finding the least destructive accommodation between § 7 and property rights. The majority's assertion to this effect notwithstanding, our cases do not require a prior showing regarding reasonable alternatives as a precondition to any inquiry balancing the two rights. The majority can hardly fault the Board for a decision which "conflates . . . two stages of the inquiry," *ante,* at 538, when no two-stage inquiry has been set forth by this Court.

Third, and more fundamentally, *Babcock* is at odds with modern concepts of deference to an administrative agency charged with administering a statute. See *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837 (1984). When reviewing an agency's construction of a statute, we ask first whether Congress has spoken to the precise question at issue. *Id.,* at 842. If it has not, we do not simply impose our own construction on the statute; rather, we determine if the agency's view is based on a permissible construction of the statute. *Id.,* at 843. *Babcock* did not ask if Congress had specifically spoken to the issue of access by third parties and did not purport to explain how the NLRA specifically dealt with what the access rule should be where third parties are concerned. If it had made such an inquiry, the only basis for finding statutory language that settled the issue would have been the language of § 7, which speaks only of the rights of employees; *i. e.,* the Court might have found that § 7 extends no access rights at all to union representatives. But *Babcock* itself recognized that

---

the extent that it addressed the relevant issues, it reaffirmed the refined and more detailed guidance offered by *Hudgens.*

employees have a right to learn from others about self-organization, 351 U. S., at 113, and itself recognized that in some circumstances, §§ 7 and 8 required the employer to grant the union access to parking lots. So have later Courts, and so does the Court today.

That being the case, the *Babcock* Court should have recognized that the Board's construction of the statute was a permissible one and deferred to its judgment. Instead, the Court simply announced that as far as access is concerned, third parties must be treated less favorably than employees. Furthermore, after issuing a construction of the statute different from that of the Board, rather than remanding to the Board to determine how third parties should be dealt with, the *Babcock* Court essentially took over the agency's job, not only by detailing how union organizer access should be determined but also by announcing that the records before it did not contain facts that would satisfy the newly coined access rule.

Had a case like *Babcock* been first presented for decision under the law governing in 1991, I am quite sure that we would have deferred to the Board, or at least attempted to find sounder ground for not doing so. Furthermore, had the Board ruled that third parties must be treated differently than employees and held them to the standard that the Court now says *Babcock* mandated, it is clear enough that we also would have accepted that construction of the statute. But it is also clear, at least to me, that if the Board later reworked that rule in the manner of *Jean Country*, we would also accept the Board's change of mind. See *NLRB* v. *Curtin Matheson Scientific, Inc.*, 494 U. S., at 787; *NLRB* v. *J. Weingarten, Inc.*, 420 U. S. 251, 265–266 (1975).

As it is, the Court's decision fails to recognize that *Babcock* is at odds with the current law of deference to administrative agencies and compounds that error by adopting the substantive approach *Babcock* applied lock, stock, and barrel. And unnecessarily so, for, as indicated above, *Babcock* certainly

does not require the reading the Court gives it today, and in any event later cases have put a gloss on *Babcock* that the Court should recognize.

Finally, the majority commits a concluding error in its application of the outdated standard of *Babcock* to review the Board's conclusion that there were no reasonable alternative means available to the union. Unless the Court today proposes to turn back time in the law of judicial deference to administrative agencies, the proper standard for judicial review of the Board's rulings is no longer for " 'erroneous legal foundations,' " *ante,* at 539, but for rationality and consistency with the statute. *Litton Financial Printing Div.* v. *NLRB,* 501 U. S. 190 (1991); *NLRB* v. *Curtin Matheson Scientific, Inc., supra; Fall River Dyeing & Finishing Corp.* v. *NLRB,* 482 U. S. 27, 42 (1987); *NLRB* v. *Financial Institution Employees,* 475 U. S. 192, 202 (1986); *Beth Israel Hospital,* 437 U. S., at 501. "The judicial role is narrow: . . . the Board's application of the rule, if supported by substantial evidence on the record as a whole, must be enforced." *Ibid.* The Board's conclusion as to reasonable alternatives in this case was supported by evidence in the record. Even if the majority cannot defer to that application, because of the depth of its objections to the rule applied by the Board, it should remand to the Board for a decision under the rule it arrives at today, rather than sitting in the place Congress has assigned to the Board.

The more basic legal error of the majority today, like that of the Court of Appeals in *Chevron,* is to adopt a static judicial construction of the statute when Congress has not commanded that construction. Cf. 467 U. S., at 842. By leaving open the question of how § 7 and private property rights were to be accommodated under the NLRA, Congress delegated authority over that issue to the Board, and a court should not substitute its own judgment for a reasonable construction by the Board. Cf. *id.,* at 844.

Under the law that governs today, it is *Babcock* that rests on questionable legal foundations. The Board's decision in *Jean Country*, by contrast, is both rational and consistent with the governing statute. The Court should therefore defer to the Board, rather than resurrecting and extending the reach of a decision which embodies principles which the law has long since passed by.

It is evident, therefore, that, in my view, the Court should defer to the Board's decision in *Jean Country* and its application of *Jean Country* in this case. With all due respect, I dissent.

JUSTICE STEVENS, dissenting.

For the first two reasons stated in JUSTICE WHITE's opinion, *ante*, at 541–545, I would affirm the judgment of the Court of Appeals enforcing the Board's order. I agree with JUSTICE WHITE that the Court's strict construction of *NLRB* v. *Babcock & Wilcox Co.*, 351 U. S. 105 (1956), is not consistent with *Hudgens* v. *NLRB*, 424 U. S. 507 (1976), and our other cases interpreting *Babcock*. I do not, however, join his opinion to the extent that it suggests that the *Babcock* case was incorrectly decided, *ante*, at 545–548. That decision rejected the Board's view that the rules applicable to union organizing draw no distinction between employees and nonemployees. I believe that central holding in *Babcock* was correct and is not inconsistent with the current law of deference to administrative agencies. Accordingly, I also respectfully dissent.