06-4961-ag
Salmon Run v. NLRB

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2007

Argued: April 11, 2008                                  Decided: July 18, 2008

Docket No. 06-4961-ag(L)
Docket No. 06-5510-ag(XAP)

_____

SALMON RUN SHOPPING CENTER LLC,

*Petitioner*,

−v.−

NATIONAL LABOR RELATIONS BOARD,

*Respondent-Cross-Petitioner*,

_____

Before :

CABRANES and WESLEY,

*Circuit Judge*s,

and CASTEL,

*District Judge.**

_____

Petition for review and cross-application for enforcement of an order of the National

Labor Relations Board based upon a finding that a mall operator had committed an unfair labor

_____

* The Honorable P. Kevin Castel, United States District Judge for the Southern District of
New York, sitting by designation.

practice in not granting permission to union members to distribute literature at the mall. The petition for review is granted, the Board's order is vacated, and the petition for enforcement of the order is denied.

––––––––––––––

DAVID M. GARBER, Mackenzie Hughes LLP, Syracuse, NY, *for Petitioner-Cross-Respondent.*

KIRA DELLINGER VOL, Washington, D.C., (Julie B. Broido, Supervisory Attorney, Ronald Meisburg, General Counsel, John E. Higgins, Jr., Deputy General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, *on the brief*), National Labor Relations Board, Washington, D.C., *for Respondent-Cross Petitioners.*

––––––––––––––

CASTEL, *District Judge*:

This is a petition by the operator of a shopping mall, Salmon Run Shopping Center, LLC, to review a final order of the National Labor Relations Board ("NLRB" or "Board") directing it to cease and desist from denying members of the Empire State Council of Carpenters and members of its Local 747 (collectively, the "Carpenters' Union") access to its mall for the purpose of distributing literature. The Board has cross-petitioned for enforcement of its cease and desist order. For the reasons that follow, enforcement of the Board's order is denied.

Background

Petitioner operates the Salmon Run Mall in Watertown, New York, a large shopping mall with 95 retail tenants, including J.C. Penney and Sears. It is an enclosed facility surrounded by roadways and parking areas. A new mall tenant, Dick's Sporting Goods ("Dick's"), remodeled

existing retail space in preparation for opening. Dick's employed a contractor, Lewiston Construction, who, in turn, utilized a subcontractor who had employed non-union carpenters. The grand opening of Dick's was scheduled for the weekend of August 14, 2003.

The day before the opening, Ronald Timmerman, a representative of the Carpenters' Union, approached the marketing director of Salmon Run Mall, Karla Woods, and asked about setting up a table where members of the Carpenters' Union could distribute literature. Ms. Woods gave Timmerman an insurance form to complete and told him to propose two dates for the distribution. On August 22, Timmerman wrote to Woods proposing September 13 and September 27 and enclosing an insurance certificate.

On August 29, Timmerman visited Woods at the mall to inquire about the status of the request. She reported that she had not looked at the paperwork but would respond the following week. When Timmerman heard nothing further, he returned to the mall on September 19 and was told by Woods that she had never received a request from a union before and was going to contact her corporate offices for advice. About ten days later, Timmerman returned to the mall and, this time, asked to speak with the manager, Mary Dudo, who said she would look into the matter. After a further unproductive visit, Timmerman received a call from Woods on October 7 who expressed the view that the Carpenters' Union was a for-profit venture, a point Timmerman disputed. Woods repeated that she had never received a request from a union before and added that the mall operator's feeling was that if it let one union in then it would have to let others in and therefore it was drawing the line and not granting the Carpenters' Union's request.

The Carpenters' Union filed complaints with the NLRB on November 26, 2003 and January 8, 2004. On April 7, 2004, the Union's attorney provided the Union with a copy of the

3

Mall's "Community Access Form," which the Mall had not provided to the Union during their earlier encounters. The Union completed the form and requested permission to distribute literature on May 14 and June 11, 2004. A week later, Dudo responded in writing that "[w]e welcome civic, charitable, or other organizations to solicit in the common areas of the mall when the solicitation will benefit both the organization and our tenants." The letter went on to state that "[b]ased upon these criteria, we are unable to grant your application at this time."

Administrative Proceedings

The General Counsel of the NLRB filed a complaint against petitioner. A hearing was held before an Administrative Law Judge ("ALJ") at which Timmerman and Dudo testified to the largely uncontested facts of the interaction between the Salmon Run Mall and the Carpenters' Union.

The parties did not dispute that there were no employees of the Salmon Run Mall who were members of the trade represented by the Carpenters' Union and no employees of Salmon Run Mall were targets of the proposed activities. The intended audience, according to Timmerman, was the "general public."

At the hearing, Timmerman confirmed that at no time did a representative of the mall ever inquire as to the content of the literature that the Carpenters' Union sought to distribute. He offered examples of the type of literature it would have distributed had it been permitted to do so. The literature highlighted the advantages of membership in Local 747, including apprenticeship programs and training opportunities. One handout stated, "It makes sense to . . . Let us Show You the Money," and lists the benefits of membership in the Carpenters' Union, which include "excellent wages" and "safe jobsites." Another handout was directed at Dick's, noting its record

4

profits and its prior use of a contractor who, in turn, utilized a subcontractor who had employed non-union carpenters "who did not pay the area standard wage as set by the Empire Regional Council Carpenters." The handout urged the reader to "ask Dicks [sic] why they are hiring contractors that keep worker[s'] wages in a 'slump' when they report record sales and earnings."

Dudo testified that the mall has "No Solicitation" signs posted at its entrance doors. In deciding whether to allow a non-tenant group to distribute or solicit, she, as manager and final decision maker, considers whether the activity will benefit the mall. An activity may benefit the mall in two primary ways--increasing foot traffic or enhancing the public image of the mall. The mall has allowed the American Cancer Society to offer a holiday gift wrapping service because it enhances the mall's public image. The activities of the Children's Miracle Network enhance its image and also increase foot traffic of mothers with children. The mall's "Higher Ed Night," in which education institutions hand out literature, increases foot traffic on a weekday night measured in the hundreds of customers.

Under the "benefit-the-mall" standard, United Food and Commercial Workers, Local 1 ("UFCW"), was given permission to set up a table at the mall's health fair, providing information as to how the union benefitted the community. A local firefighters' union was granted permission to conduct its fund raising drive for the Muscular Dystrophy Association in which passers-by were asked to fill a fireman's boot with contributions. The requests of these two unions and that of the Carpenters' Union were the only union requests the mall had ever received.

The ALJ found that the operator of Salmon Run Mall had violated section 8(a)(1) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(a)(1), by refusing to allow the

5

Carpenters' Union to set up a table and distribute literature at the mall, and recommended issuance of a cease and desist order.

On appeal, a three-member panel of the Board concluded that the mall operator had excluded the Carpenters' Union from its property because it was a labor organization and thereby had engaged in an unfair labor practice. With slight modification, it adopted the ALJ's recommended order.

Standard of Review

This matter comes to this Court upon the mall operator's petition for review and the Board's cross-petition for enforcement of its order. 29 U.S.C. § 160(e) & (f). In that context, the Board's factual findings, if "supported by substantial evidence on the record considered as a whole," will be conclusive. Id. "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." NLRB v. Local 32B-32J Serv. Employees Int'l Union, 353 F.3d 197, 199 (2d Cir. 2003) (citation and internal quotation marks omitted). "[R]eversal based upon a factual question will only be warranted if, after looking at the record as a whole, we are left with the impression that no rational trier of fact could reach the conclusion drawn by the Board." NLRB v. Albany Steel, Inc., 17 F.3d 564, 568 (2d Cir. 1994) (alterations omitted).

The Board's legal conclusions must be "reasonably based." NLRB v. Katz's Delicatessen of Houston Street, Inc., 80 F.3d 755, 763 (2d Cir. 1996). The NLRB "often possesses a degree of legal leeway when it interprets its governing statute, particularly where Congress likely intended an understanding of labor relations to guide the Act's application." NLRB v. Town & Country Elec., Inc., 516 U.S. 85, 89-90 (1995). But once the statute has been judicially interpreted, the

6

Board's subsequent interpretation must be judged against prior controlling precedent. Lechmere, Inc. v. NLRB, 502 U.S. 527, 536-37 (1992).

Discussion

Section 7 of the NLRA guarantees to "[e]mployees . . . the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. As the Supreme Court noted when considering the actions of a shopping mall operator with respect to the employees of the tenants of the mall, mall operators are "employer[s] engaged in commerce within the meaning of §§ 2(6) and (7) of the [NLRA]," and "statutory 'employer[s]' may violate § 8(a)(1) with respect to employees other than [their] own." Hudgens v. NLRB, 424 U.S. 507, 510 n.3 (1976); see also 29 U.S.C. §§ 152 (3), (6), (7) and (13) (defining "employee," "commerce," "affecting commerce," and "agent" for purposes of the NLRA).

Absent special circumstances, employees have the right to engage in organizational activities at their employer's place of business in non-working areas during non-working hours. Dist. Lodge 91, Int'l Ass'n of Machinists and Aerospace Workers, AFL-CIO v. NLRB, 814 F.2d 876, 880 (2d Cir. 1987). Accordingly, while an employer may "promulgate and enforce a rule prohibiting union solicitation during working hours, it [is] not within the province of an employer to promulgate and enforce a rule prohibiting union solicitation by an employee outside of working hours, although on company property." Republic Aviation Corp. v. NLRB, 324 U.S. 793, 803 n.8 (1945) (internal quotations omitted). "[N]o such obligation is owed to nonemployee organizers," however. NLRB v. Babcock & Wilcox Co., 351 U.S. 105, 113

7

(1956).

In the context of an organizational campaign, Babcock upheld the right of the employer to exclude nonemployees except where (1) the organizational activity was directed at employees who are inaccessible through other means; and (2) "the employer's notice or order does not discriminate against the union by allowing other distribution." Id. at 112. These two exceptions to the rule that an employer may keep out nonemployee union organizers have come to be known as the "inaccessibility" exception and the "discrimination" exception. Only where the facts establish one of these two exceptions must the Board next consider the extent to which the property rights of an employee must yield to the organizational activities of the nonemployee. Id. Simply put, the Board may not fashion a remedy without first considering whether section 7 rights are at issue and whether a Babcock exception applies. Lechmere, 502 U.S. at 536-37.

In reviewing the Board's order in the instant case, which rested exclusively upon a claim of discrimination, we must first decide whether section 7 employee rights to self-organization were at issue. This requires consideration of whether section 7 has any application to this literature distribution, which was directed at the general public but had a "self-organizational" aspect. We conclude, as did the Board, that section 7 rights were, indeed, implicated by the proposed distribution. We also agree with the Board that the case is controlled by Babcock, but conclude that the Board's articulation of the standard by which to assess whether "discrimination"—as defined in Babcock—occurred was not reasonable. See Long Island Head Start Child Dev. Serv. v. NLRB, 460 F.3d 254, 257 (2d Cir. 2006) (noting that we "review[] the Board's legal conclusions to ensure that they have a reasonable basis in law" (citation and internal quotation marks omitted)). Because we conclude that the facts do not amount to

8

discrimination under a properly framed standard, we deny enforcement of the Board's order.

<u>The Content and Context of the Section 7 Rights Asserted.</u>

Not all literature that members of a labor organization might seek to distribute invokes self-organization, mutual aid or other section 7 considerations. See <u>Eastex, Inc. v. NLRB</u>, 437 U.S. 556, 563 (1978) ("The first [question] is whether, apart from the location of the activity, distribution of the newsletter is the kind of concerted activity that is protected from employer interference by §§ 7 and 8(a)(1) of the National Labor Relations Act."). It is clear, however, that the "'right of self-organization depends in some measure on [the employee's] ability . . . to learn the advantages of self-organization from others.'" <u>Lechmere</u>, 502 U.S. at 532 (quoting <u>Babcock,</u> 351 U.S. at 113) (second alteration in original). The brochures and hand-outs at issue in the instant case highlighted the benefits of membership in the Carpenters' Union. Accordingly, we conclude that the content of these materials could conceivably trigger section 7 protections.

In addition, some of the literature was aimed at informing the public of Dick's prior use of a subcontractor who did not pay "area standard" wages. We assume that literature criticizing the payment of wages below the "area standard" by an employer may also be protected under section 7. Cf. <u>Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters</u>, 436 U.S. 180, 206 (1978) ("assum[ing]," for the purposes of a <u>Babcock</u> analysis, that a protest that an employer does not meet "area standards" is protected under section 7).[1]

_____

[1]The Court in <u>Sears</u> viewed it as a "serious question" whether an area-standard protest is entitled to the same deference under <u>Babcock</u> as organizational activities. <u>Sears</u>, 436 U.S. at 206 n.42. It noted that "several factors make the argument for protection of trespassory area-standards picketing as a category of conduct less compelling than that for trespassory organizational solicitation." <u>Id.</u> See also <u>Be-Lo Stores v. NLRB</u>, 126 F.3d 268, 284 (4th Cir. 1997) ("[W]e seriously doubt, as do our colleagues in other circuits, that the <u>Babcock & Wilcox</u> disparate treatment exception, post <u>Lechmere</u>, applies to nonemployees who do not propose to engage in organizational activities.").

9

But the content of the literature alone does not determine whether any section 7 rights of "employees" have been asserted. See Lechmere, 502 U.S. at 532 ("By its plain terms, . . . the NLRA confers rights only on *employees,* not on unions or their nonemployee organizers."); Sears, 436 U.S. at 206 n.42 ("Babcock makes clear that the interests being protected by according limited-access rights to nonemployee, union organizers are not those of the organizers but of the employees located on the employer's property.") The context of the distribution must also be examined. Hudgens, 424 U.S. at 521-22; see Eastex, 437 U.S. at 572-73 (examining context of the case in deciding whether the Babcock exceptions or a different rule should apply).

The intended audience of the Carpenters' Union was the "general public." No employees of the mall or of its tenants were specifically targeted by the Carpenters' Union. Although it is possible that a non-union carpenter or a potential apprentice would be at the mall on the day of a permitted distribution, there is no evidence that there was a greater likelihood of reaching a potential union member at the mall than at any other public place on that day.

Accordingly, the content and context of the proposed literature distribution approaches the unprotected end of the spectrum. Though the rights of nonemployees in a distribution of literature to the general public on private property are weak, the Board's implicit conclusion that section 7 rights were at issue and that Babcock applies was reasonably based.

### Babcock-type Discrimination

The Board's order rested exclusively on the Babcock discrimination exception, which has never been applied by the Supreme Court or this Court. In Lechmere, the Court identified the "limited scope" of the inaccessibility exception, noting that "Babcock's exception was crafted precisely to protect the § 7 rights of those employees who, by virtue of their employment, are

10

isolated from the ordinary flow of information that characterizes our society." 502 U.S. at 540. A brief examination of Lechmere's explication of the inaccessibility exception sheds some light on the intended breadth of the discrimination exception.

In Lechmere, a union conducted a campaign to organize the employees of a retail tenant of a large shopping mall and the campaign included placing literature on the windshields of cars parked in the mall parking lot. Id. at 529-30. The mall operator endeavored to enforce its ban on distribution of literature by asking the union organizers to leave and by removing the literature. Id. The Court denied enforcement of the Board's order granting the union organizers access to the mall and reiterated its prior observations that "trespasses of nonemployee union organizers are 'far more likely to be unprotected than protected,'" and that the burden imposed on the union to justify access to the nonemployer's property was "'a heavy one'" which had not been met. Id. at 535 (quoting Sears, 436 U.S. at 205).[2] The Board cites no reason why the burden in the discrimination context ought to be any less "heavy" than under the inaccessibility exception. We note that the Sixth Circuit has construed Babcock's discrimination exception to mean "favoring one union over another, or allowing employer-related information while barring similar union-related information." Sandusky Mall Co. v. NLRB, 242 F.3d 682, 686-87 (6th Cir. 2001). This interpretation has found favor with the Fourth Circuit, which has expressed its "doubt that an employer's approval of limited charitable or civic distribution while excluding union distribution constitutes discrimination." Be-Lo Stores, 126 F.3d at 284.

---

[2] Specifically, the availability of mailings, phone calls, home visits, signs and advertising precluded a Board finding that there were no reasonable means of access other than entry onto another's property. Lechmere, 502 U.S. at 540-41. See also Metro. Dist. Council of Phila. v. NLRB, 68 F.3d 71, 72, 75 (3d Cir. 1995) (area-standards handbilling on privately-owned site directed at condominium buyers did not satisfy inaccessibility exception).

In deciding whether discrimination had been proven in the instant case, the Board focused on the mall operator's actions, which it viewed as demonstrating an intent to disfavor union activity. It concluded that "the decision to exclude was based upon the mere fact that the Union is a union seeking to engage in labor-related speech." Of particular significance to the Board was that the mall operator "did not know what the [Union's] literature would say." Because the Board's focus was on the mall operator's motives and not on a comparison of the treatment of speakers on a subject that section 7 protects, we conclude that the Board's interpretation was not reasonable.

The focus of the discrimination analysis under section 7 of the Act must be upon disparate treatment of two like persons or groups. See Guardian Indus. Corp. v. NLRB, 49 F.3d 317, 319 (7th Cir. 1995) ("A person making a claim of discrimination must identify another case that has been treated differently and explain why that case is the same in the respects the law deems relevant or permissible as grounds of action." (internal quotation marks omitted)). The standard for assessing discrimination must take account of the general rule that a private property owner need not provide a forum for expression on its property and may be arbitrary and inconsistent in its selection of speakers. See Hudgens, 424 U.S. at 520-21.

To amount to Babcock-type discrimination, the private property owner must treat a nonemployee who seeks to communicate on a subject protected by section 7 less favorably than another person communicating on the same subject. The disparate treatment must be shown between or among those who have chosen to enter the fray by communicating messages on the subject, whether employers or employees. Under this standard, a mall operator could not allow Dick's to defend its contractors' use of carpenters who were paid below area standard wages but

not allow the Carpenters' Union to tell its side of the story. It could not allow a competing union to distribute organizational literature but preclude the Carpenters' Union from doing so. The solicitation of Muscular Dystrophy donations by firefighters or the distribution of educational promotional materials on Higher Ed Night do not serve as valid comparisons to the Carpenters' Union distribution of literature touting the benefits of its apprenticeship programs or decrying the failure of a mall tenant to pay area standard wages. Only the "rare case" satisfies Babcock's inaccessibility exception, Lechmere, 502 U.S. at 537, and it may be that the same holds true under our interpretation of the discrimination exception.

The result we reach is in substantial agreement with the understanding of the Sixth Circuit, which has construed Babcock's discrimination exception in the context of nonemployees seeking to engage in organizational or informational activities at a private mall. See Sandusky Mall, 242 F.3d at 686. There was no evidence in this record that any employer was permitted to communicate to the general public, through the use of mall facilities, its reasons for not paying area standard wages to members of a unionized trade. Nor was any competing labor group permitted to engage in efforts to organize members of their trade. Accordingly, the Board's conclusion that the operator of the mall had discriminated against the Carpenters' Union cannot stand.

The petition to review is granted, the Board's order is vacated, and the petition to enforce the Board's order is denied.