LUCILE SALTER PACKARD
CHILDREN'S HOSPITAL AT
STANFORD, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 95–1524.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 10, 1996.

Decided Oct. 11, 1996.

Laurence R. Arnold, San Francisco, CA, argued the cause and filed the briefs for petitioner.

John E. Arbab, Washington, DC, National Labor Relations Board, argued the cause for respondent, with whom Linda R. Sher, Associate General Counsel, South Euclid, OH, Aileen A. Armstrong, Deputy Associate General Counsel, Peter D. Winkler, Supervisory Attorney, and William A. Baudler, Attorney, Washington, DC, were on the brief.

Before: WALD, SILBERMAN and SENTELLE, Circuit Judges.

Opinion for the court filed by Circuit Judge WALD.

WALD, Circuit Judge:

The Lucile Salter Packard Children's Hospital at Stanford ("the Hospital") petitions to set aside the decision and order of the National Labor Relations Board ("NLRB" or "Board") adopting the administrative law judge's ("ALJ") determination that the Hospital violated section 8(a)(1) of the National Labor Relations Act ("NLRA" or "Act") by enforcing its ban on nonemployee solicitation in a manner that discriminated against unions. The Board cross-petitions for enforcement of the order. In the proceedings before the agency, the ALJ found that petitioner had failed to apply its no-solicitation rule forbidding "outsiders" from soliciting on hospital property to various vendors whose products were not part of the Hospital employees' regular benefit package. Since by denying the union the same access to its employees the Hospital had violated section 8(a)(1) of the NLRA, the ALJ recommended that the Hospital be ordered to cease interfering with its employees' section 7 rights by discriminatorily enforcing its no-solicitation rule, and that the Hospital be required to post a notice informing its employees of the Board's decision and of the fact that union representatives would thereafter be permitted to solicit employees on the Hospital premises. The Board adopted the ALJ's recommended order. Because we find that the Board's conclusions are supported by substantial evidence, we deny the Hospital's petition for review and grant the Board's cross-petition for enforcement of the order.

## I. BACKGROUND

No material facts of this case are in dispute. The Lucile Salter Packard Children's Hospital at Stanford ("the Hospital") operates an acute care pediatric hospital in Palo

Alto, California.[1] The Hospital has an official, written, no-solicitation policy, which provides:

**Solicitation and distribution of literature on Hospital property**

In order to prevent disruption in the operation of the hospital, interference with patient care, and inconvenience to our patients and their visitors, the following rules will apply to solicitation and distribution of literature on hospital property.

*Outsiders*

Persons not employed by the hospital may not solicit or distribute literature on hospital property for any purpose at any time. . . .

Joint Appendix ("J.A.") 265 n.3; 267.

Despite this rule, the Hospital has regularly allowed nonemployee representatives of certain outside groups to solicit the Hospital's employees from tables and booths in the hallway adjacent to the Hospital's public cafeteria. These outside groups include the Stanford Federal Credit Union ("SFCU"), which solicits employees to become members; California Casualty, a private insurance company that sells insurance coverage (including insurance for automobiles, homes, and other assets) to employees; and Stanford Child & Family Services ("SCFS"), which distributes information and referrals about local family care resources to the Hospital's employees. California Casualty and SCFS solicit employees outside the cafeteria once a month; SFCU solicits employees more irregularly. On occasion, the Hospital also authorizes medical textbook publishers to display books of interest to physicians and other health professionals.

In addition, the Hospital permits a number of different vendors to sell their wares across from the Hospital cafeteria as part of activities run by the Packard Employees Activity Committee ("PEAC").[2] PEAC is a voluntary association of employees and hospital administrators that sponsors recreational events for hospital employees and purchases gifts, such as flowers and balloons, for employees on significant occasions. PEAC raises funds by charging outside vendors a percentage of their gross receipts (10%–15%) as a fee for doing business on Hospital premises. Under the aegis of the PEAC, the Hospital allows a vendor to sell flowers outside the cafeteria twice a month, and has on occasion allowed jewelry vendors and a vendor of designer hospital-style scrub uniforms, "Scrub Duds," to sell their products on the Hospital's premises.

In January 1994, the American Federation of State, County and Municipal Employees, District Council 57, AFSCME, AFL–CIO ("the Union")[3] began organizing the Hospital's nurses. On February 14, union representative Linda Kahn visited the Hospital to distribute union literature. When she attempted to set up a table in the hallway outside the Hospital's public cafeteria from which to hand out literature, she was approached by the Hospital's vice president for human resources, who notified Kahn that it was contrary to hospital policy for her to solicit employees on the hospital premises. Thereafter, the Hospital refused to allow union representatives access to the Hospital.

In response to this action, the Union filed an unfair labor practice charge against the Hospital on February 16, 1994. The regional director issued a complaint on March 28, 1994, which the Hospital timely answered. A hearing on the issues was held before Administrative Law Judge Gerald A. Wacknov. On December 29, 1994, ALJ Wacknov issued a decision, finding that, by permitting numerous other nonemployee solicitations, the Hospital had discriminated against the Union in its application of the no-solicitation rule. He recommended that the Hospital be ordered

1. The Hospital is an employer engaged in commerce within the meaning of section 2(2), (6), and (7) of the NLRA.

2. The PEAC was created by the Hospital and is overseen by the Hospital's Human Resources Department. The decisions of the PEAC are subject to the approval or veto of the Hospital. All bills incurred by the PEAC are paid by the Hospital out of its general account and charged against the PEAC budget. All funds raised by the PEAC are given to the Hospital and credited to the PEAC's budgetary sub-account. *See* Petitioner's Brief, at 15–16.

3. The Union is a labor organization within the meaning of section 2(5) of the NLRA.

to permit solicitation by the Union in the same manner that the Hospital permitted other entities to do so.

The NLRB issued its final decision and order affirming the ALJ and adopting his decision and recommended order on August 21, 1995. *See Lucile Salter Packard Children's Hospital at Stanford,* 318 N.L.R.B. no. 49, 1995 WL 502109.

The Hospital filed a petition for review and to set aside the order of the NLRB, arguing that the Board's affirmance of the ALJ's decision was not supported by substantial evidence and was contrary to existing law. This court has jurisdiction of the appeal under 29 U.S.C. § 160(f).

## II. DISCUSSION

Section 7 of the NLRA guarantees employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection...." 29 U.S.C. § 157 (1994). Section 8(a)(1) of the Act makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed by section 7." 29 U.S.C. § 158(a)(1) (1994).

 Generally speaking, an employer cannot be compelled to permit nonemployee union agents to distribute literature or solicit memberships on the employer's property. *Lechmere, Inc. v. NLRB,* 502 U.S. 527, 533, 537, 112 S.Ct. 841, 845, 847–48, 117 L.Ed.2d 79 (1992). But this general rule admits of two important exceptions. First, under the "inaccessibility" exception, an employer violates section 8(a)(1) if it denies a union access to the employer's property where the union has no other reasonable means of communicating its message to employees. *See Lechmere,* 502 U.S. at 533–34, 112 S.Ct. at 845–46 (citing *NLRB v. Babcock & Wilcox Co.,* 351 U.S. 105, 112, 76 S.Ct. 679, 684, 100 L.Ed.

975 (1956)). Second, under the "non-discrimination" exception, an employer engages in discrimination as defined by section 8(a)(1) if it denies union access to its premises while allowing similar distribution or solicitation by nonemployee entities other than the union. *See Babcock,* 351 U.S. at 112, 76 S.Ct. at 684; *Lechmere,* 502 U.S. at 535, 112 S.Ct. at 846; *Sears, Roebuck & Co. v. San Diego County District Council of Carpenters,* 436 U.S. 180, 205, 98 S.Ct. 1745, 1761, 56 L.Ed.2d 209 (1978); *D'Alessandro's, Inc.,* 292 N.L.R.B. 81, 83–84, 1988 WL 214277 (1988).

 We deal here with the scope of the second, "non-discrimination" exception. An employer may not exercise its usual right to preclude union solicitation and distribution on its property if the employer permits similar activity by other nonemployee entities "in similar, relevant circumstances." *Jean Country,* 291 N.L.R.B. 11, 12 n. 3, 1988 WL 214053 (1988). If a union is able to demonstrate that the employer treated nonunion solicitations differently than union solicitations, then the Board will find a violation of section 8(a)(1) unless the employer-approved nonunion solicitations fit into one of two exceptions to the "non-discrimination" rule. First, the employer's decision to permit nonunion solicitation does not violate the provision if the solicitations at issue consist only of "a small number of isolated 'beneficent acts'" that constitute narrow exceptions to the employer's otherwise absolute policy against outsider solicitation. *See, e.g., Guardian Industries Corp. v. NLRB,* 49 F.3d 317, 321 (7th Cir.1995) ("[A]n employer does not 'discriminate' against unions by barring labor solicitation on the premises while permitting a few isolated instances of charitable solicitation."); *Hammary Mfg. Corp.,* 265 N.L.R.B. 57, n. 4, 1982 WL 23979 (1982) ("The Board and the courts consistently have held that an employer does not violate [section] 8(a)(1) by permitting a small number of 'beneficent acts' as narrow exceptions to a no-solicitation rule."); *Emerson Electric Co.,* 187 N.L.R.B. 294 (1970).[4] Second, no violation of section

---

**4.** The fact that the nonemployee solicitations permitted by the employer are "charitable" in nature, however, is not in itself sufficient to immunize the practice of disparately treating union solicitations. Indeed, in *NLRB v. Stowe Spinning*

*Co.,* 336 U.S. 226, 233, 69 S.Ct. 541, 544, 93 L.Ed. 638 (1949), the Supreme Court affirmed a section 8(a)(1) violation in a case where the nonunion solicitations allowed were all charitable or noncommercial in nature. Thus, the *fre-*

8(a)(1) occurs if the solicitations approved by the employer relate to the employer's business functions and purposes. In the hospital context, these activities have included "blood drives" and pharmaceutical and medical textbook displays, as well as fundraising sales that constituted an integral part of the hospital's necessary functions. *See, e.g., Rochester General Hospital,* 234 N.L.R.B. 253, 1978 WL 7193 (1978); *George Washington University Hospital v. Pomerantz,* 227 N.L.R.B. 1362, 1374 n. 39, 1977 WL 8273 (1977).

 The ALJ and the Board applied these interpretations of section 8(a)(1) to this case and found that the Hospital violated that provision by discriminating against union solicitations, and that the Hospital's actions did not fall under either of the two exceptions to the "non-discrimination" rule. In reviewing the Board's order, this court must give considerable deference to the Board's interpretation of the NLRA, and must accept the Board's determinations if they are supported by substantial evidence. *See, e.g., S.H. Camp & Co. v. NLRB,* 160 F.2d 519 (6th Cir.1947); *NLRB v. J. Weingarten, Inc.,* 420 U.S. 251, 266, 95 S.Ct. 959, 968, 43 L.Ed.2d 171 (1975). Pursuant to this standard of review, we conclude that the Board's determination is supported by substantial evidence and that, therefore, the Hospital's petition for review and to set aside the order is denied.

Among his findings, the ALJ determined that some of the nonemployee solicitations permitted by the Hospital did not constitute violations of section 8(a)(1) because they were related to the Hospital's business functions or purposes. For example, he concluded that it was permissible under the Act for the Hospital to allow solicitations by "entities [that] are intimately related to the fringe benefits that the Hospital offers its employees." J.A. 267. Such permissible solicitations included those by nonemployee representatives of the tax-sheltered annuity plans

and various health insurance plans offered by the Hospital as part of its benefits package. Also allowable were sales of medical textbooks, which qualified "as a part of the Hospital's practice of educational enhancement." J.A. 267. The Board affirmed the ALJ's findings in this regard, and neither party challenges that conclusion.

On the other hand, the ALJ ruled that it was not acceptable under section 8(a)(1) for the Hospital to allow "[c]ertain other services [that] are neither part of the [Hospital's] fringe benefit package nor intimately related to the enhancement of health care," at the same time that it refused to permit the union to solicit employees. J.A. 267. The solicitations that the ALJ found impermissible included those by the Stanford Federal Credit Union, the child and family services organization, a company (California Casualty) selling insurance that was not part of the Hospital's regular employee benefit plan, and PEAC-sponsored sales to raise money for its social programs. The ALJ said that none of these activities fell within the exception for business-related purposes of the employer. As to the credit union and insurance solicitations, the ALJ explained that these were impermissible nonemployee solicitations under the Hospital's no-solicitation policy because "[t]hese products are not a part of the employees' regular benefit package." J.A. 268. With regard to the PEAC activities, the ALJ determined that the fact that the vendors were approved by the PEAC and were required to contribute a percentage of their proceeds to the PEAC "does not negate the fact that the plain language of the [no-solicitation] rule that the [Hospital] seeks to enforce specifically precludes such activity by nonemployees." J.A. 268.[5]

The Board agreed with the ALJ's conclusion that the Hospital had violated section 8(a)(1)'s nondiscrimination rule by allowing "nonemployee commercial organizations to

---

*quency* of the nonunion solicitations allowed may be as important as the *nature* of those solicitations.

5. The ALJ also rejected the Hospital's argument that these nonemployee vendors and representatives were "agents" of the Hospital, rather than "outsiders" within the meaning of the Hospital's

no-solicitation rule. He stated: "Apparently, the Respondent considers an agent to be anyone with whom it has a voluntary relationship, and an outsider to be anyone who is not an agent." J.A. 268. The ALJ and the Board found this argument to be "without merit." J.A. 268, 265.

solicit and distribute materials in the hallway near the cafeteria." J.A. 265. The Board also affirmed the ALJ's conclusion that the nonemployee solicitations did not fall into either of the two exceptions to the "nondiscrimination" rule. First, the products sold on the premises, "such as insurance other than health care and jewelry," were not related to the Hospital's business purposes or functions because they were "neither related to the hospital's health care function [n]or, as discussed by the [ALJ], part of the employees' regular benefit package." J.A. 266. Second, the Board concluded that the activities permitted by the Hospital did not fall under the narrow exception to the nondiscrimination rule for "a small number of isolated 'beneficent acts.'" J.A. 266. The Board reasoned that, since the Hospital "*regularly* allowed various *commercial* entities to solicit their wares and services to employees despite its no-solicitation policy," the Hospital's allowance of noncharitable, for-profit solicitations on a regular basis did not fall under the narrow "beneficent acts" exception. J.A. 266 (emphasis added).[6]

No one contests on appeal the Board's determination that the Hospital's decision to allow informational solicitations relating to its employee fringe benefit program did not violate section 8(a)(1). Those solicitations were integrally related to the Hospital's necessary business functions. However, the Hospital claims that several of its other nonemployee solicitations, including those for home and automobile insurance coverage by California Casualty, the child and family services referral group, and the credit union

membership, should also have been permitted under section 8(a)(1) without imposing an obligation to allow the union access as well.

■ We disagree. As the ALJ noted, "'[i]t is well established that disparate application of even an otherwise valid no-solicitation proscription, so as to preclude union organizational solicitation while permitting or sanctioning other solicitation, violates [s]ection 8(a)(1) of the Act.'" J.A. 268 (quoting *Ameron Automotive Centers*, 265 N.L.R.B. 511, 1982 WL 24033 (1982)). In this case, the Hospital indisputably applied its purportedly absolute no-solicitation rule in a discriminatory manner, excluding union activities while permitting various solicitations by nonemployee entities such as the credit union, the outside insurance company, and the PEAC-sponsored vendors.

■ Moreover, we find that the Board reasonably determined that the Hospital's solicitations do not fall within either of the two exceptions to the NLRA's nondiscrimination rule. First, substantial evidence supports the conclusion that the activities allowed by the Hospital did not constitute a small number of beneficent or charitable acts so as to be exempted from the general rule against nondiscrimination.[7] Not only were several of the various activities carried out on a regular basis, amounting to more than a "small number" of solicitations, but also the nature of most of the solicitations was *commercial*, not charitable. Thus, for example, the credit union and the outside insurance company were both soliciting customers for purely commercial purposes.[8]

6. In addition, the Board adopted the ALJ's recommended remedy for the section 8(a)(1) violation, which was to require the Hospital to cease discriminating against the Union with regard to access to its property, and to ensure that the Hospital posted a notice informing its employees about the Board's decision. Neither party challenges the Board's authority to order such a remedy and, at any rate, we find that such a remedy is well within the Board's administrative authority.

7. The Hospital mentions this exception in its brief (Petitioner's Brief, at 19–20), but fails to explain why this exception should apply to the solicitations it allowed. Instead, the Hospital argues that some precedents interpreting section 8(a)(1) are permissive enough to allow an em-

ployer to authorize "a wide variety of nonbeneficent, commercial solicitations bearing no arguable connection to its business" without violating that provision. Petitioner's Brief, at 41–45. We reject this interpretation of section 8(a)(1). The Board has made clear in numerous cases discussed in the text that an employer may not discriminate against union activities unless the permitted activities fall within one of the two aforementioned narrow exceptions. Thus, unless the Hospital can show that the solicitations at issue here did fall under one of those exceptions, its argument must fail.

8. We decline to reach the issue of whether certain of the permitted solicitations, standing alone, could be excused under the "small num-

■ Second, substantial evidence supports the conclusion that most of the Hospital's permitted solicitation activities were not related to its legitimate business purposes and functions. The Hospital argues that the authorized solicitations should be viewed either as activities that relate to the employer's business functions and purposes (like, for example, blood drives and medical textbook displays), or as business-related fundraising activities. Petitioner's Brief, at 20. Indeed, as explained above, the Board did find that it was permissible for representatives of the Hospital's self-funded benefit programs, such as the tax sheltered annuity plans and health insurance plans offered as part of the Hospital's regular employee benefit program, to set up booths at the Hospital. According to the Hospital, solicitations by the credit union, the outside insurance company, and the child and family referral service were indistinguishable from solicitations by representatives of the Hospital's own benefit plan since they claim that "[t]he record unequivocally establishes that the Hospital considered each of these services to be an employee benefit." Petitioner's Brief, at 23.

The Hospital's argument is unavailing. We find that the Board drew a reasonable distinction between solicitations regarding benefits paid for in whole or in part by the Hospital, which the ALJ found to be "intimately related" to the Hospital's regular benefit package, and the solicitations at issue here, which involve products and services purchased out of the employees' own pockets.[9] For example, in *D'Alessandro's, Inc.*, 292 N.L.R.B. no. 27, 1988 WL 214277 (1988), the Board found a violation of section 8(a)(1) in a case in which the employer's property "was regularly the scene of a wide range of commercial and other activity unrelated to the operation of the store." *Id.* at *4. Among the activities deemed as commercial activities unrelated to the employer's business purposes in that case were instances of hand billing in the parking lot, a "for sale" sign on a car in the parking lot, and sales of cider and pumpkins during the fall. *Id.* at *2. Such solicitations are analogous to the purely commercial activities by the credit union and the outside insurance company at issue here. Failure to draw any line between regular Hospital-subsidized employee benefits and nonsubsidized employer-approved "benefits," would mean that the Hospital could deem any nonemployee solicitations it wished as a "benefit" for its employees, while still excluding Union solicitations.[10] To allow

---

ber of charitable acts" exception. For example, it is unclear whether a small number of PEAC-sponsored fundraising activities, by themselves, would constitute illicit discrimination under section 8(a)(1). It could be argued that since PEAC-sponsored vendors must contribute a portion of their proceeds to the PEAC, that this constitutes a charitable activity.

However, even if isolated PEAC-sponsored sales would count as "charitable" in nature, this would not change the fact that the nature of many of the solicitations involved here is commercial, not charitable, and that even those activities which could be classified as "charitable"—such as the PEAC-sponsored activities— have been permitted in numbers exceeding what is permitted under this narrow exception. *See, e.g., Serv–Air, Inc.*, 175 N.L.R.B. 801 (1969) (explaining that the Board is to evaluate the "quantum of ... incidents" involved in order to determine whether the number of charitable solicitations permitted is small enough to preclude a finding of unlawful discrimination by the employer).

9. In addition, as the Board points out, the mere fact that

the Hospital was willing to provide a payroll deduction, or checkoff, for payments to Cali-

fornia Casualty and the Stanford Federal Credit Union has no bearing on the analysis here, despite the Hospital's claim (Br 23) to the contrary. The checkoff does not alter the character of the solicitations themselves. It merely reflects the Hospital's opinion that the products and services offered by those entities, but not those offered by the Union, are worthy of the Hospital's assistance.

NLRB Brief, at 16. Indeed, the Hospital could also have provided a checkoff for Union dues, if it had so desired. *See id.* at 16 n. 5.

10. We find reasonable the Board's argument that:

Other than subjective preference, the Hospital has no meaningful basis for distinguishing between the solicitations by California Casualty and the Stanford Federal Credit Union, on the one hand, and those by the Union, on the other. All have as their common objective the enticement of the Hospital's employees to avail themselves of membership, products, or services ostensibly conducive to their financial or personal well-being.

NLRB Brief, at 17. Union membership, no less than credit union membership, might be viewed by many employees as a "benefit."

such a subjective criterion to govern access would eviscerate section 8(a)(1)'s purpose of preventing discriminatory treatment of unions by employers who permit other nonemployee entities to solicit on the employer's property.[11]

■ The Hospital similarly argues that the various PEAC-sponsored sales activities should have fallen under the second exception to the nondiscrimination rule because they are fundraisers intimately related to the Hospital's necessary business functions. However, we find that the Board reasonably distinguished PEAC fundraising activities from those activities found within the business-related exception in *Rochester General Hospital*, 234 N.L.R.B. 253, 1978 WL 7193 (1978), and *George Washington University Hospital v. Pomerantz*, 227 N.L.R.B. 1362, 1374 n. 39, 1977 WL 8273 (1977). In *Rochester*, all of the activities deemed permissible under section 8(a)(1) were clearly related to the Hospital's business purposes. They included blood drives, display of pharmaceutical products, and display of medical books, all of which were indisputably related to the Hospital's primary purpose of "carrying out its community health care functions and responsibilities." 1978 WL 7193 at *11. And, although the Hospital did permit some fundraising activities, those activities "donate[d] all the proceeds [of their sales] to the Hospital." *Id.* Similarly, in *George Washington*, the nonemployee fundraising activities permitted under section 8(a)(1) were only those which donated all their proceeds to the Hospital itself and which could be viewed "as virtually an integral part of the hospital's necessary functions." 227 N.L.R.B. 1362, 1374 n. 39. Here, by contrast, the small percentage of sales proceeds that the PEAC takes from its vendors goes into a separate account, allocated to the PEAC's activities. The PEAC uses these funds for social and

recreational purposes, like birthday flowers for employees, that are not directly related to the Hospital's primary health care function, and therefore not integral to the Hospital's operations.

Nevertheless, the Hospital predictably contends that the PEAC-sponsored activities are related to the Hospital's business purposes because they enhance morale by keeping employees happy and productive. Though not entirely without logic, we are not persuaded that this argument carries the day under the NLRA when the goal is to identify activities that are intrinsic to the employer's operations. The Board convincingly responded,

> insofar as the Hospital attempts to distinguish PEAC's activities—and derivatively, the vending activities that support them—on the grounds that they improve employee morale, that objective is comparable to that of the Union. *See Restaurant Corp. Of America v. NLRB*, 827 F.2d 799, 806 n. 4 (D.C.Cir.1987) (rejecting employer's attempt to distinguish some solicitations as conducive to employee morale, noting that employer's no-solicitation rule was a ban on all solicitations).

NLRB Brief, at 19.

Furthermore, the Hospital's reliance on several additional precedents to support its argument that its no-solicitation rule has not been discriminatorily applied is misplaced. The Seventh Circuit held in *Guardian Industries Corp. v. NLRB*, 49 F.3d 317 (7th Cir.1995), that an employer could permit employees to post "for sale" notices on the employer's bulletin board without allowing employees to post notices of union meetings. However, that case is not clearly analogous to the situation here. In *Guardian*, all outside entities were treated similarly under the employer's ban on posting notices. Thus, there was no discrimination against nonem-

---

11. The Hospital contends that the PEAC and its authorized vendors are all agents of the Hospital who should be permitted to conduct business on behalf of the Hospital; it claims that, as agents of the Hospital, the PEAC and its vendors were not "outsiders" under the Hospital's no-solicitation rule, and thus were not banned from solicitation. *See* Petitioner's Brief, at 31 ff.

But the mere fact that the PEAC and its vendors contributed funds to the Hospital's general account could not, in and of itself, be deemed sufficient to transform those vendors into agents of the Hospital. Indeed, "the Union also was prepared to make a contribution to PEAC in order to obtain permission to set up a table and solicit employees." NLRB Brief, at 19. Surely, the mere act of making such a contribution would not transform the Union into a Hospital agent.

ployee union groups, as required for a violation of section 8(a)(1). 49 F.3d at 320–22. Here, in contrast, the Hospital permits non-employee solicitations outside its cafeteria that are indistinguishable in nature from Union solicitations.

The Hospital also claims a stake in the Supreme Court's decision in *Perry Education Ass'n v. Perry Local Educator's Ass'n*, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). It argues:

> In [*Perry*], the Court found that just because a public employer extended the use of its intraorganization mail system to some types of organizations, it was not required to extend use of that system to a union attempting to organize its employees, since the organizations permitted to use the system were not similar to a union. In the instant case the Hospital, a private employer that permitted nonemployee solicitation in connection with its perceived business-related purposes only, should be able to prohibit every other dissimilar type of nonemployee solicitation including union solicitation.

Petitioner's Brief, at 42. *Perry*, however, does not support the Hospital's stance. As discussed above, the Board properly deemed impermissible the solicitations by PEAC and other groups that were not integrally related to the Hospital's necessary business functions. *Perry* found it crucial that the groups permitted to use the intraorganization mail system were engaged in activities of educational relevance to students, and therefore were integrally related to the school's primary educational purpose. As the Board correctly argues, that distinction is akin to the one drawn by Board precedents such as *Rochester General Hospital*, 234 N.L.R.B. 253, 1978 WL 7193 (1978), which distinguish, for section 8(a)(1) purposes, between those

solicitations that are integrally related to a hospital's purpose and those that are not.

Finally, the Hospital claims that the Board overlooked the special concerns that a health care institution has in maintaining a peaceful, nondisruptive environment for the health of its patients. *See* Petitioner's Reply Brief, at 4–9. However, the Board aptly points out that "the Hospital has not shown that the Union's attempted solicitation—simply the distribution of materials from a table near the Hospital's cafeteria—was any more disruptive than those allowed by the Hospital, which involved similar distributions of materials from tables near the cafeteria." NLRB Brief, at 17. The Hospital's assertion that Union materials are inherently disturbing and disruptive represents a value judgment pure and simple, counteracted by the Union's perception that its effect might be quite the opposite.[12]

### III. CONCLUSION

For the foregoing reasons, we conclude that the Board's finding that the Hospital violated section 8(a)(1) was supported by substantial evidence. The Hospital discriminated against the Union in its application of a purportedly absolute no-solicitation rule. Accordingly, we deny the Hospital's petition for review and to set aside the order of the Board, and we grant the Board's cross-petition for enforcement of the order.

*So ordered.*

---

12. A final technical point: the Hospital claims that "[t]he Board improperly attempts to save its decision by offering *post hoc* analyses and distinctions to justify its conclusions." Petitioner's Reply Brief, at 20. Although it is true that some of the explanations offered by the Board in its brief go into somewhat more detail than in its

actual ruling, their essence can clearly be found in the Board's rationale. Moreover, the Board's ruling, its analyses, and its citations to precedents stand on their own, wholly apart from the Board's advocacy, and thus we would, in any case, uphold its ruling under the substantial evidence standard of review.