**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 10 1998**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

## UNITED STATES COURT OF APPEALS
## TEND CIRCUIT

ALBERTSON'S, INCORPORATED,

    Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD,

    Respondent,

No. 97-9509

UNITED FOOD AND COMMER-
CIAL WORKERS UNION, LOCAL
394,

    Intervenor.

Appeal from the National Labor Relations Board
(No. 18-CA-13715)

Brian Michael Mumaugh (Monique A. Tuttle with him on the briefs), of Holland
& Hart LLP, Denver, Colorado, for the Petitioner.

Ana L. Avendano, Attorney  (Margaret Gaines Neigus, Supervisory Attorney, and
Anne Marie Lofaso, Attorney, with her on the brief), of the National Labor
Relations Board, Washington, D.C., for Respondent.

Robert D. Metcalf, Kathryn M. Engdahl, and Connie L. Howard, of Garber & Metcalf, P.A., Minneapolis, Minnesota, on the brief for Intervenor.

---

Before **SEYMOUR**, Chief Judge, **MCWILLIAMS**, Senior Circuit Judge, and **MURPHY**, Circuit Judge.

---

**SEYMOUR**, Chief Judge.

The National Labor Relations Board (NLRB) brought unfair labor practice charges against Albertson's, Inc. (Albertson's) under section 8(a)(1) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(a)(1). The NLRB's complaint alleged that Albertson's engaged in disparate enforcement of its no-solicitation policy against the union representing Albertson's employees, thereby assisting employees in filing a decertification petition, and engaged in surveillance of employees' union activities by confiscating and photocopying pro-union materials. After a hearing, an administrative law judge (ALJ) issued a decision and recommended order finding that Albertson's had committed unfair labor practices. The NLRB adopted the ALJ's findings of fact, conclusions of law, and recommended order. Albertson's appeals, contending that the NLRB's section 8(a)(1) holdings are contrary to law and not supported by substantial evidence, and that the NLRB improperly held the decertification petition tainted by the alleged unfair labor practices. The NLRB has cross-petitioned for enforcement of its order. We affirm and enforce the NLRB's order.

## I.

Albertson's operates a grocery store in Rapid City, South Dakota, where it engages in the retail sale of groceries and employs approximately 100 people. At all times relevant to this litigation, Albertson's had the following "no-

solicitation" policy:

> Non-employees may not solicit, distribute literature or use sound devices on Company premises at any time.

> Employees who are working should not be disturbed, interrupted or disrupted by solicitations or the distribution of literature. Unauthorized presence of any employee in the non-selling areas of the store or in other non-public areas of our facility for any purpose is strictly prohibited unless the employee is on duty, preparing to come on duty, or preparing to leave after having been on duty.

> No employee may engage in solicitation of any kind during working time, or while the person(s) he or she is soliciting is on working time. Further, no employee may distribute literature during working time or in working areas (note: working time does not include authorized periods of off-duty times – e.g., meal time, break time, etc.).

Rec., vol. 2, General Counsel's Ex. 2.

According to the findings of the ALJ,[1] certain Albertson's employees in the spring of 1994 undertook a union organizing campaign. Employee David Dahl spoke with fellow employees about the union and distributed election authorization cards. In March 1994, store director Dan Yeazel informed Dahl that

---

[1] In stating the facts, we defer to the NLRB's reasonable findings because the NLRB "is empowered to draw permissible inferences from credible testimony." NLRB v. L&B Cooling, Inc., 757 F.2d 236, 241 (10th Cir. 1985). As a general rule, we will not disturb the NLRB's assessment of the credibility of witnesses who testify before it. See International Guards Union of America, Local 69 v. NLRB, 789 F.2d 1465, 1467 (10th Cir. 1986) (citing NLRB v. Montgomery Ward & Co., 429 F.2d 1127 (10th Cir. 1970)).

he was displeased about Dahl's union organizing activities. When Dahl asked Yeazel's permission to speak with employees in the break room while they were off the clock, Yeazel refused and suggested that Dahl's pro-union efforts threatened his status with the company. Albertson's later reduced Dahl's hours, resulting in the union's filing of charges with the NLRB and an eventual private settlement agreement.

In June 1994, the union won a representation election and bargained over the course of the next year with Albertson's over the terms and conditions of a collective bargaining agreement. During this time, store cashier Diane Pesek, a local union supporter, became a member of the union negotiating committee and attended bargaining sessions. Sometime in 1994, shortly after the election, Pesek attempted to circulate a petition concerning year-round school in Rapid City. Grocery manager John Binger told Pesek that such solicitation on the sales floor or while Pesek was on the clock violated company policy.

In July 1995, cashiers Gary Wehner and Carmel Lefor became dissatisfied with the union's inability to negotiate a collective bargaining agreement and discussed circulating a decertification petition. Wehner approached Yeazel for information on how to go about decertifying the union and Yeazel gave him the telephone number of the NLRB's regional office. Wehner also spoke with Christopher Yost, Albertson's labor relations representative, who apprized him of

the company policy regarding solicitation. Wehner and two others subsequently circulated a decertification petition over a four-day period between July 18 and July 21 and secured 43 signatures, several of which were those of supervisors. Wehner and his colleagues solicited signatures while they were themselves on the clock and solicited others who were on the clock.

It is also clear that several Albertson's supervisors witnessed and participated in on-the-clock solicitation for the decertification petition. On one occasion, supervisor Randy Stewart witnessed but did not prohibit Wehner from attempting to solicit Pesek's signature as she stood in line as a customer to buy groceries during a busy period at the store.[2] Pesek testified that the solicitation occurred between 4:30 and 5:00 P.M. and that Stewart was working at a check stand, an indication that the store was busy. On another occasion, Wehner solicited the signature of employee Jerray Bachman in the presence of supervisor Dave Motorude, who also did nothing to stop Wehner. Other supervisors signed the petition while they were working and discussed the petition with other employees who were working. For example, employee Nancy Anderson solicited the signature of liquor store manager Kirk Murphy at approximately 10:00 or 11:00 A.M. while he was waiting on customers. Anderson took over Murphy's check stand while he went to ask managers Yeazel and Stewart whether he was

---

[2]Pesek was on maternity leave at the time.

-6-

allowed to sign the petition. They informed him that he was permitted to sign and suggested that he should take his break and do so.

On September 15, 1995, shortly following her return from maternity leave, Pesek spoke to union president Tom Johnson about Wehner's decertification efforts. Later, at approximately six o'clock in the evening (an undisputedly busy time at the store), Johnson brought a pro-union petition attached to a clipboard to the check stand where Pesek was working and handed it to her while she was waiting for a customer to sign a check. Pesek then passed the petition to two other employees and asked them to sign it. These events transpired in a period of approximately twenty seconds. Supervisor Connie Mehrer witnessed this exchange and directed supervisor Sally Weaver to find out what was on the clipboard. Although Pesek specifically told Weaver that she was circulating a petition, Weaver confiscated the petition, carried it away, photocopied it, and placed it in the company's safe. When Pesek asked Weaver to return the petition, Weaver informed her that Yeazel had said she could not have it until she got off work and that she was not to have it on the sales floor or at any time she was on the clock.

Based on these facts, the NLRB found that Albertson's had violated section 8(a)(1) of the NLRA by disparately enforcing its no-solicitation policy and by engaging in surveillance of the employees' union activities. The NLRB

subsequently ordered Albertson's to cease and desist from these unfair labor practices and to post copies of an appropriate remedial notice.[3]

## II.

Albertson's contends the NLRB's decision that it violated section 8(a)(1) of the NLRA by disparately enforcing its no-solicitation policy and engaging in unlawful surveillance is not supported by substantial evidence. While our review of the NLRB's legal determinations is *de novo*, see Medite of New Mexico, Inc. v. NLRB, 72 F.3d 780, 785 (10th Cir. 1995), we uphold the NLRB's factual findings if they are supported by substantial evidence in the record as a whole. 29 U.S.C. § 160(e) (1994); see also NLRB v. L & B Cooling, Inc., 757 F.2d 236, 241 (10th Cir. 1985) (citing Universal Camera Corp. v. NLRB, 340 U.S. 474 (1951)). "'Substantial evidence' is evidence that a reasonable mind might accept as adequate to support a conclusion." NLRB v. Oklahoma Fixture Co., 79 F.3d 1030, 1033 (10th Cir. 1996) (citing Intermountain Rural Elec. Ass'n v. NLRB,

---

[3]As we discuss *infra*, Albertson's places great significance on the status of the decertification petition, claiming that it was dismissed as part of the NLRB's determination that Albertson's committed unfair labor practices. However, neither the NLRB's order nor the record before this court contains any reference to dismissal of the decertification petition. We therefore assume for the sake of responding to the assertions set forth in Albertson's brief that any dismissal or suspension of the petition occurred in accordance with the NRLB's authority to regulate representation elections under section 9 of the NLRA. See 29 U.S.C. § 159 (1994).

984 F.2d 1562, 1566 (10th Cir. 1993)).

Section 7 of the NLRA protects employees' right "to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157 (1994). Employers violate section 8(a)(1) of the NLRA if they "interfere with, restrain, or coerce employees in the exercise of [these] rights." 29 U.S.C. § 158(a)(1) (1994). Although it is well established that employers may legitimately prohibit solicitation in working areas during work time, see Republic Aviation Corp. v. NLRB, 324 U.S. 793, 798-99 (1945), an otherwise valid rule may violate the NLRA if it is enforced in a discriminatory manner, see Midwest Stock Exch., Inc. v. NLRB, 635 F.2d 1255, 1270 (7th Cir. 1980). Disparate enforcement in favor of an anti-union solicitation amounts to unlawful assistance by the employer in violation of section 8(a)(1) by giving the impression that the employer is "in effect outwardly encouraging and endorsing" the permitted solicitations. Cf. Waste Stream Management, Inc., 315 N.L.R.B. 1099, 1122 (1994).

Albertson's contends the NLRB's finding of disparate enforcement lacks the support of substantial evidence because the evidence in the record demands the conclusion that Albertson's allowed both pro- and anti-union solicitations at

the workplace and during work time and prohibited employee Pesek from engaging in pro-union solicitation only because it disrupted customer service at a busy hour. We find no merit in this assertion. First, as we have previously noted, we will not disturb the NLRB's determinations of witness credibility or lack thereof except in rare circumstances. See Osteopathic Hosp. Founders Ass'n v. NLRB, 618 F.2d 633, 638 (10th Cir. 1980) ("[I]t is not within our province to upset a credibility determination of a hearing officer absent extraordinary circumstances."). In this case, the NLRB adopted the ALJ's credibility assessments, as do we. See Ready Mixed Concrete Co. v. NLRB, 81 F.3d 1546, 1551 (10th Cir. 1996); NLRB v. Whitlow Corp., 666 F.2d 1294, 1299-1300 (10th Cir. 1981); Rocky Mountain Natural Gas Co. v. NLRB, 326 F.2d 949, 952 (10th Cir. 1964) (citing Universal Camera Corp. v. NLRB, 340 U.S. 474 (1951) ("The probative force that should be given an examiner's report reaches its highest significance when an issue turns upon credibility.").

The ALJ found that Albertson's engaged in disparate enforcement of its no-solicitation policy beginning on July 18, 1995, when it allowed employee Wehner and others to solicit support for a decertification petition on work time even though it had prohibited another employee from doing the same in support of a pro-union petition in 1994, and even though it later prohibited employee Pesek

from soliciting union support in September 1995.[4]  Although Albertson's contends that management interfered with employee Pesek's solicitation effort only because she was disrupting customer service, the ALJ specifically found that employee Pesek's activities had not in fact disrupted customer service; that at least one of employee Wehner's solicitations in favor of the decertification petition also took place during a busy period at the store -- so busy, in fact, that a supervisor was working at one of the check stands;[5] and that liquor store manager Murphy discussed the decertification petition with employee Anderson while he was on the clock waiting on customers.  Moreover, the ALJ found that the employer made no reference to customer disruption in strictly enforcing the no-solicitation policy against employee Dahl in 1994, and that a supervisor admonished Pesek for allegedly disrupting customer service, and told Pesek not to circulate her petition during any work time, even though management allowed Wehner to circulate his decertification petition freely while he was on the clock.  The record contains testimony to support each of these findings.  We therefore decline to disturb the ALJ's determinations as to which witnesses provided credible testimony and

[4]In addition, the record contains evidence that Albertson's refused to allow Pesek to circulate a petition concerning year-round schools during work time without regard to disruption of customer service.

[5]The ALJ found employee Wehner "to be a totally unreliable witness" and discredited his assertions that he neither disrupted work nor solicited for the decertification petition on company time.  Rec., vol. 3, ALJ Order at 13, n.13.

-11-

which did not.[6]

Albertson's remaining arguments against the NLRB's decision are similarly unavailing. Albertson's contends the NLRB erroneously relied on events that were too remote in time from the circulation of the July 1995 decertification petition in determining that Albertson's engaged in disparate enforcement of its no-solicitation policy. In doing so, however, Albertson's mischaracterizes the nature of the disparate enforcement claim. Albertson's apparently believes that a finding of disparate enforcement requires a finding that the employees' decisions to sign the decertification petition was in some way influenced by the employer's unfair labor practices. Such is not the case.

An employer violates section 8(a)(1) merely by enforcing a no-solicitation policy in a discriminatory manner, regardless of whether the employees take action based on the company's discrimination. See Lucile Salter Packard

---

[6]On this and other points, Albertson's offers alternative ways in which the testimony proffered to the ALJ might have been viewed. That there might be other ways of construing the evidence does not indicate that the manner in which the ALJ chose to view it was unreasonable. Contrary to Albertson's repeated assertions that the NLRB presented no evidence of disparate enforcement or surveillance, the NLRB in fact presented the testimony of several witnesses on both issues. The ALJ decided to credit these witnesses over Albertson's witnesses, which he was fully entitled to do given that he is the one who heard their testimony and observed their demeanor on the witness stand. See Medite of New Mexico, Inc., 72 F.3d at 785 (quoting NLRB v. Walton Mfg. Co., 369 U.S. 404, 405 (1962)) (reviewing court "may not 'displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*.'").

-12-

Children's Hosp. v. NLRB, 97 F.3d 583, 589 (D.C. Cir. 1996) (finding violation of section 8(a)(1) where company regularly allowed non-union solicitations while prohibiting union solicitations); Midwest Stock Exch., Inc., 635 F.2d at 1270 (same). The NLRB relied on Albertson's refusal to allow pro-union solicitations in 1994 and again in September 1995 as evidence of the company's discrimination in favor of anti-union activities and not as evidence that the company created an atmosphere that led employees to sign the decertification petition. It defies logic to suggest, as Albertson's does, that the NLRB must look only to company prohibitions of pro-union solicitations occurring at the very moment it is permitting anti-union solicitations in order to assess whether the company is engaging in disparate enforcement. The NLRB must necessarily look at the company's practices over a period of time in order to determine discriminatory enforcement. As such, the NLRB's reliance on this evidence was entirely proper. See Lucile Salter Packard Children's Hosp., 97 F.3d at 589 (finding 8(a)(1) violation after determining company regularly, and over a period of time, allowed non-union solicitations while prohibiting union solicitations); Montgomery Ward & Co. v. NLRB, 692 F.2d 1115, 1123 (7th Cir. 1982) (concluding company engaged in disparate enforcement of no-solicitation policy based on other incidents where company allowed non-union solicitations).

Albertson's also contends the NLRB should not have relied on the events of

-13-

1994 in assessing the disparate enforcement claim because Albertson's settled a section 8(a)(1) charge involving employee Dahl based on those events. Albertson's asserts that consideration of evidence relating to a settled charge where the company made no admissions of wrongdoing effectively discourages settlement. Once again, Albertson's analysis misses the mark. The settlement agreement entered into by Albertson's involving alleged threats and reprisals against employee Dahl was based on offenses entirely separate from those alleged here. Indeed, the only testimony relating to those events that is relevant to the case at hand is the fact that Albertson's strictly enforced its no-solicitation policy when Dahl requested to engage in union solicitation, an action that was not unlawful at the time because no discriminatory enforcement was then alleged. The NLRB appropriately relied on testimony concerning Dahl's request as evidence of an occasion of strict enforcement which does indicate discrimination when viewed in the light of Albertson's later willingness to tolerate Wehner's anti-union solicitations on company time. See, e.g., NLRB v. Southeastern Stages, Inc., 423 F.2d 878, 880 & n.2 (5th Cir. 1970) (presettlement conduct may be used as background evidence in support of a different violation).

Finally, Albertson's argues the ALJ ignored evidence that Albertson's routinely allowed Union President Johnson to speak with and solicit employees during work time and that had the ALJ considered this evidence he could not have

found disparate enforcement of the no-solicitation policy. While it is true that Albertson's apparently allowed Mr. Johnson considerable leeway in visiting employees at the store during work time, it is undisputed that Mr. Johnson was not himself an employee of Albertson's. Albertson's treatment of Mr. Johnson thus does not demonstrate that Albertson's did not engage in disparate enforcement of its no-solicitation policy as between employees of the store. We might be inclined to agree with Albertson's had it demonstrated that Dahl and Pesek were prohibited from soliciting in favor of the union only because their actions were disrupting work. However, testimony in the record plausibly supports the ALJ's conclusion that the company was not motivated solely (if at all) by concern for customer service. We therefore cannot say that the ALJ's view of the facts as indicating the company treated *employees* who engaged in anti-union solicitations differently from those who engaged in pro-union and other kinds of solicitations was unreasonable or insupportable. We affirm the NLRB's determination that Albertson's violated section 8(a)(1) by engaging in disparate enforcement of the no-solicitation policy.

We next turn to Albertson's claim that there is not substantial evidence to support the NLRB's determination that Albertson's engaged in surveillance of union activities in violation of section 8(a)(1). An employer "may observe public union activity, particularly where such activity occurs on company premises," but

an employer violates section 8(a)(1) where company officials "do something 'out of the ordinary'" to keep union activities under watch. NLRB v. Southern Maryland Hosp. Ctr., 916 F.2d 932, 938 (4th Cir. 1990) (quoting Metal Indus., Inc., 251 N.L.R.B. 1523 (1980)). Here, the NLRB adopted the ALJ's finding that Albertson's engaged in surveillance by "allowing the open circulation of the decertification petition in work areas on work time and then subsequently asking Pesek, who was doing the same thing, what she was circulating, and then confiscating and copying it." Rec., vol. 3, ALJ Order at 17.

Albertson's cites several cases for the proposition that a company does not engage in surveillance when an employee conducts solicitations in plain view on the company's premises. See, e.g., Aplt. Br. at 42 (citing Irving Tanning Co., 273 NLRB 6 (1984)). In this case, however, Albertson's management did not merely "observe" and order a halt to Pesek's activities, but also confiscated her petition and copied it. It is irrelevant that management later offered to return the petition because it does not change the fact that management held the petition for a period of several hours and made a copy of it. See, e.g., NLRB v. Intertherm, Inc., 596 F.2d 267, 273 (8th Cir. 1979) (finding unlawful surveillance where supervisor merely took and looked at union authorization card without confiscating it). Based on our review of the record, we are persuaded the ALJ's conclusion that such actions could tend to inhibit employees in the exercise of their protected

-16-

rights, see Montgomery Ward, 692 F.2d at 1128,  was reasonable and supported by substantial evidence.

We turn finally to Albertson's assertion that the NLRB erroneously concluded the July 1995 decertification petition was "tainted" by unfair labor practices, thereby leading it to dismiss the petition.[7]  The NLRB responds that it did not find the petition tainted, that no such finding was required in order to find Albertson's had committed unfair labor practices, and that this court should not review the disposition of the petition at this time.  We agree with the NLRB.

The NLRB's decision does not include any finding that the decertification petition was tainted by Albertson's unfair labor practices, nor does it order the dismissal of the decertification petition based on any alleged taint.  Albertson's

---

[7]Albertson's expends considerable effort arguing that the NLRB cannot block an election without first applying the multi-factored Master Slack test, and finding the decertification petition was tainted.  But the numerous cases Albertson's cites for this proposition are inapposite.  See, e.g., Williams Enter. v. NLRB, 956 F.2d 1226 (D.C. Cir. 1996); Master Slack Corp., 271 NLRB 78, 84 (1984).  The Master Slack line of cases is applied when an employer withdraws recognition from or refuses to bargain with a certified union based on a decertification petition, not when the NLRB declines to hold an election because of unfair labor practices.  The Master Slack test comes in to determine whether the employer's unfair labor practices tainted the decertification petition, or whether the employer acted in good faith and should be allowed to rely on it in refusing to bargain with the union.  See, e.g., NLRB v. D & D Enter., Inc., 125 F.3d 200, 209 (4th Cir. 1997); Columbia Portland Cement Co. v. NLRB, 979 F.2d 460, 462-464 (6th Cir. 1992); Louisiana-Pacific Corp. v. NLRB, 858 F.2d 576, 579 (9th Cir. 1988). We have uncovered no case, and Albertson's cites none, applying the Master Slack "taint" analysis to a mere finding of disparate enforcement.

claims the NLRB in fact later suspended or dismissed the petition for a decertification election according to its "blocking procedure."[8]  See generally, John P. Luddington, Annotation, Unremedied Unfair Labor Practice Charge to NLRB Election as Ground for Postponing Election ("Blocking Charge" Procedure), 18 A.L.R. FED. 420 (1974).  We note that courts have approved the blocking procedure as properly within the NLRB's statutory authority to conduct representation elections and have held that a "blocking" decision falls under the NLRB's authority to oversee representation proceedings.  See, e.g., Bishop v.

---

[8] According to the NLRB's Casehandling Manual:
   The agency has a general policy of holding in abeyance any representation case . . . or union deauthorization . . . case where pending unfair labor practice charges filed by a party to the [representation or union deauthorization] cases are based upon conduct of a nature which would have a tendency to interfere with the free choice of the employees in an election, were one to be conducted on the petition.
NLRB Casehandling Manual ¶ 11730 (last modified Aug. 19, 1998) <http://www.nlrb.gov/chm2.html>.
   Although not formally authorized by statute or regulation, the NLRB has followed this procedure since 1937.  See Bishop v. NLRB, 502 F.2d 1024, 1028 (5th Cir. 1974) (citing U.S. Coal & Coke, 3 NLRB 398 (1937)).  It does so on the theory that since unfair labor practices may prevent a fair election, which would require the election to be set aside, it is best simply to suspend action on a representation question during the pendency of an unfair labor practice charge and for as long as the violation remains unremedied.  See id. at 1028-29; 1 THE DEVELOPING LABOR LAW 392-93 (Patrick Hardin, et al., eds., 3d ed. 1992).   The employees who support decertification may circulate another petition once "the union has had an opportunity to operate free from the employer's unfair labor practices."  Bishop, 502 F.2d at 1029; see also Luddington,18 A.L.R. FED. at 443 (noting that once an employer fully complies with an NLRB order, new decertification proceedings are not blocked).

NLRB, 502 F.2d 1024, 1028-29 (5th Cir. 1974); Furr's Inc. v. NLRB, 350 F.2d 84, 86 (10th Cir. 1965); Pacemaker v. NLRB, 260 F.2d 880, 882 (7th Cir. 1958); Spark's Nugget, Inc. v. Scott, 583 F. Supp 78, 80 & n.5 (D. Nev. 1984). It is thus unreviewable absent "a plain violation of an unambiguous and mandatory provision of a statute." Leedom v. Kyne, 358 U.S. 184 (1958); see also Bishop, 502 F.2d at 1027 (noting that committing such decisions to the NLRB's discretion comports with Congress's determination that "the NLRB, and not the courts, is to be the umpire in representation disputes.")

Because we uphold the Board's finding of unfair labor practices, we are not in a position to "unblock" the decertification election if, in fact, it was blocked. Cf. Bishop, 502 F.2d at 1029. The NLRB's decision whether to hold an election based on the decertification petition is discretionary. Even so, we suggest that any harm to employees seeking decertification resulting from the blocking of the petition is slight in that employees are free to file a new petition so long as it is circulated and signed in an environment free of unfair labor practices.

## III.

We **AFFIRM** the NLRB's decision finding that Albertson's engaged in unfair labor practices and **ENFORCE** the NLRB's order.

-19-