In the

# United States Court of Appeals
## For the Seventh Circuit

---

Nos. 14-3528 & 14-3729

CATERPILLAR INC.,

*Petitioner/Cross-Respondent*,

*v.*

NATIONAL LABOR RELATIONS BOARD,

*Respondent/Cross-Petitioner*,

*and*

UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTUR-
ING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS IN-
TERNATIONAL UNION, AFL-CIO CLC,[*]

*Intervening Respondent.*

---

Petition for review and cross-application
for enforcement of an order of the
National Labor Relations Board.
No. 30-CA-064314

---

[*] This is the official name of the union commonly referred to as the Unit-
ed Steelworkers union.

ARGUED SEPTEMBER 9, 2015 — DECIDED OCTOBER 2, 2015

————————————

Before POSNER, MANION, and HAMILTON, *Circuit Judges*.

POSNER, *Circuit Judge*. We are asked to review an order by the National Labor Relations Board requiring Caterpillar Inc. to allow a union official to investigate the site of a fatal accident to a worker represented by a local of the union.

An Illinois company, Caterpillar is one of the world's largest manufacturers of construction and mining equipment, diesel and natural gas engines, industrial turbines, and diesel-electric locomotives. In July 2011 it bought from Bucyrus International a factory in South Milwaukee that manufactures large strip-mining equipment. As a result of the purchase Caterpillar replaced Bucyrus as the employer party to a collective-bargaining agreement that Bucyrus had made with a local of the United Steelworkers union.

The factory has a weld shop where employees manufacture "crawlers," which resemble the tracks of a bulldozer or tank. Giant cranes lift the crawlers and move them to specified locations in the shop. Just two months after Caterpillar acquired the factory, a crane operator who was a member of the bargaining unit represented by the local union was killed when a 36-ton crawler crushed him after shifting unexpectedly while being rotated by the crane. He had been lying on the ground underneath the crawler in order to be able to unhook one of the chains attaching it to the crane. (The company's brief analogizes an investigation of the cause of the accident to an investigation of a "leaky faucet." That was in the poorest possible taste—an insult to the memory of the dead man.)

The company promptly reported the death to the local police department and to the federal Occupational Safety and Health Administration. Police officers, and agents of OSHA, along with company executives and officials of the local union, converged within hours on the accident scene. The local union's officials who visited the scene were not, however, safety specialists. The statement in the company's brief that "multiple local union officials participated in a comprehensive post-accident investigation, including assisting with a videotaped reenactment," is culpably misleading.

The local union's president called the national union's emergency response team at its headquarters in Pittsburgh and spoke to an experienced health and safety specialist there named Sharon Thompson, who has investigated a number of fatal accidents; at oral argument the company's lawyer told us the company doesn't question her credentials as an investigator of fatal accidents to workers represented by the steelworkers union.

The president of the local union informed Caterpillar's manager for the region that includes the factory in which the accident had taken place that a member of the national union's emergency response team would be coming to inspect the accident site. The manager promised to cooperate with that person but changed his mind later that evening and told the local union's president that the proposed inspection would have to be cleared with the company's legal department.

The accident had occurred in the afternoon, and that evening the company had one of its crane operators participate in a videotaped reenactment of the accident. The officials of the local who had been present at the accident scene

were not at the reenactment because they were not notified of it. The crane operator, though a member of the local union, participated in the reenactment solely in his capacity as an employee told what to do by the company, rather than as an observer on behalf of the union.

Thompson arrived at the factory the day after the accident, but the regional manager who had promised to cooperate with her refused to allow her to enter the factory without "permission from Cat[erpillar] legal to be on the premises." When that permission was denied, the union complained to company officials, but was rebuffed; the company took the position that because it was cooperating with the police and with OSHA, no further investigation of the accident was warranted. The company was however willing to allow Thompson to view the videos of the reenactment, provided that the union would sign a confidentiality agreement. It did so and received the videos, but deemed them an inadequate substitute for an on-site investigation by Thompson. She testified that none of the other materials offered to her by the company—standard work protocols, a letter describing some aspects of the crane procedure, and the police report—were adequate substitutes either. Caterpillar contends that the Board's order that Thompson be permitted to inspect the weld shop, where the accident occurred, encroached on "Caterpillar's legitimate rights to control its operations and property." Not so; Thompson's site inspection would not have interfered with the operations, or the company's control, of the plant.

OSHA fined Caterpillar for contributing to its employee's death by failing to "furnish employment and a place of employment which were free from recognized hazards … likely

to cause death or serious physical harms to employees from crashing hazards."

The cause of the accident has never been determined. The union (which continues to represent the employees in the weld shop) hopes that even now, years later, an investigation by Thompson or some other members of the national union's emergency response team might ascertain the cause and by doing so be able to suggest changes in equipment or operation that would reduce the likelihood of a future such accident. But the company has steadfastly adhered to its refusal to allow her or any other union investigator onto the premises. It argues that passage of time has mooted its disagreement with the union over allowing Thompson to investigate. That's false. Because the cause of the accidental death of the crane operator has never been determined, no serious, reliable measures to avoid a recurrence have been taken, or can be until the cause of the accident is determined— something the company appears to have no interest in. Although Caterpillar claims to have made safety improvements, no one can know whether they will prevent future accidents because no one knows what caused this accident.

Even if an investigation of the accident at this late date would be bound to be fruitless, the case would not be moot, because rescinding the Board's order would allow the company to continue to deny the union access to future accident sites. The company's choice to clean up such sites quickly cannot be allowed to defeat judicial review. For the issue is not (or not only) whether exactly this sort of accident is likely to happen. The issue is whether Caterpillar will deny access to union safety investigators in future accidents of any kind. The company does not claim to have changed its poli-

cy—it stands by it steadfastly—and so its denial of union inspection rights will be bound to recur if and when there is another accident. Imagine a case in which the company conducts its own, superficial investigation, quickly decides to blame the accident on carelessness by the victim, and then denies access to a union investigator on the ground that there is no need for further investigation. That sounds more like a violation of the union's, and their members', rights than like a moot case.

The company's obduracy resulted in the union's complaining to the National Labor Relations Board, which rendered the decision challenged by Caterpillar in this court, ordering the company to allow Thompson (or some other investigator designated by the union) to conduct an on-site investigation.

Employees have the right to "engage in … concerted activities for the purpose of collective bargaining or other mutual aid or protection," 29 U.S.C. § 157, and an employer's violation of that right is an unfair labor practice. § 158(a)(1). It is also an unfair labor practice for an employer to refuse to bargain collectively with the union representatives, § 158(a)(5)—and "bargaining" includes providing information that the bargaining representative needs. *NLRB v. Acme Industrial Co.*, 385 U.S. 432, 435–36 (1967). The Board held that Caterpillar had violated these rights, *Caterpillar Inc.*, *et al.*, 361 N.L.R.B. No. 77 (Oct. 30, 2014), and the company's petition for review of the Board's order followed. Were Thompson allowed to conduct an on-site investigation, and in the course of it discovered lax safety practices that might have caused or contributed to the accident, the correc-

tion of those practices would be a proper matter for collective bargaining.

Yet the company stands on its property rights. It's the owner of the factory in which the accident occurred and it allowed police and OSHA staff in and videotaped the reenactment and showed the videos and the police reports to the union's investigator, and it says that's good enough. It might have been good enough if, on the basis of what the police and the OSHA staff learned and the videos revealed, the company had discovered the cause of the fatal accident and taken measures to prevent any repetition of it. But the cause was not discovered, and a union is not required to accept company data as being the last word on a safety issue. *Hercules, Inc. v. NLRB*, 833 F.2d 426, 429 (2d Cir. 1987).

The cause of the accident remaining to this day unknown, the chances that Thompson or some other member of the national union's emergency response team will succeed, where OSHA failed, in determining the cause this long after the accident may well be small. But they are not zero. And Thompson may discover safety problems that could have contributed to the accident even if she proves unable to determine a single definitive cause.

At the oral argument Caterpillar's lawyer admitted that allowing Thompson to conduct an on-site investigation, which would last only a few hours and would not interfere with the factory's production, would cause "no actual harm" to the company. And the company has abandoned the argument that it made to the Board that if allowed to conduct an on-site investigation Thompson might come across confidential materials—and anyway the union has as we noted signed confidentiality agreements with the company. More-

over, Caterpillar and its predecessor, Bucyrus, had permitted politicians, customers, dealers, civic groups, and high school students to tour the factory—including the weld shop, in which the fatal accident occurred—without requiring them to sign confidentiality agreements.

The balance between the company's and the union's interests favors upholding the Board's order that the union be permitted to conduct such an investigation. See *Holyoke Water Power Co., et al.*, 273 N.L.R.B. 1369 (1985). The cost to the company would be negligible, and the benefit to the union would not be limited to the probability that Thompson's investigation would uncover the cause of the accident, though such a discovery might well lead to changes in the weld shop that would reduce the likelihood of a future accident. The union would also be demonstrating its right and ability to look out for the safety of the employees whom it represents, rather than leaving their safety entirely at the mercy of the employer. So "absent access to the accident site the Union could not fulfill its obligation to represent the employees." *ASARCO, Inc. v. NLRB*, 805 F.2d 194, 198 (6th Cir. 1986).

We can't exclude the possibility that the company's unexplained, unjustified refusal of access to Thompson was intended not only to prevent the union from investigating safety issues and perhaps discovering negligence by Caterpillar but also to demonstrate to its employees that the union can do nothing to enhance their safety. The union's duty to attend to the safety of the employees whom it represents entitles it to insist on performing its own investigation of safety issues, rather than relying entirely on data given it by the company. See *Hercules, Inc. v. NLRB*, *supra*, 833 F.2d at 429.

The superficially strongest plank in the company's argument is the videos. Given them, it argues, what more could Thompson need by way of information on which to base her advice for preventing a similar accident in the future? But one has only to view the videos, as we have done, to realize the shallowness of the argument. The videos have no text and no voice or other sound except unexplained background noise. They are very brief, and of course two-dimensional. They show—from one side only—a crawler hanging from a chain and being lowered slowly to the floor or raised from it, while being moved slowly from side to side. No one (human or dummy) is under the crawler. Although a worker occasionally appears in the videos, that is the only indication of scale, and as his height is not indicated, or the angle from which the videos were shot, it is difficult to estimate the dimensions of the objects shown in them. Apt here is the famous (if strangely titled) article by David Foster Wallace, "Federer as Religious Experience," *New York Times*, August 20, 2006, explaining that much is lost in attempts to translate a three-dimensional scene into a two-dimensional photograph or video of a scene.

Nothing in Caterpillar's videos so much as hints at an accident. To say that they depict a reenactment of the accident is absurd. Given the absence of text and sound it is impossible to understand what, relative to the accident, the videos demonstrate. Although the accident appears to have occurred because the crawler shifted a few inches unexpectedly when it was already resting partially on the ground, no such shift is visible in the videos. They provide no clue to a possible cause of the accident—as confirmed by the fact that the cause of the accident remains to this day undiscovered.

A second reenactment was staged about a week after the first. One might have expected the company to invite Thompson to the reenactment, as it would provide more insight than the videos. Needless to say, she was not invited and therefore not present. That second reenactment, by the way, vitiates the company's argument that "after the day of the accident, there was no additional information to be gleaned from on-site review of the scene, because the equipment had been moved, the area cleaned, and operations resumed." Why moving the equipment, cleaning up, and resuming operations would have rendered on-site inspection worthless is left unexplained—and if there was no information that could be obtained about the accident after the first day, why did the company conduct a reenactment a week later? Besides, if an on-site review by the union would have been doomed to futility, why did the company make such efforts to prevent the inspection?

Earlier we cited the Second Circuit's decision in the *Hercules* case. The Labor Board's decision upheld in that case contains some pungent observations that are pertinent to the present one: "In no sense then, is there merit to Respondent's argument that whatever rights the Union has to access are to be nullified because OSHA conducted an investigation." *Hercules Inc.*, 281 N.L.R.B. 961, 964 (1986). "It defies all reason to maintain that the cause of the accident could be analyzed without a physical examination of the premises … . Although witness reports, production reports, and operating manuals no doubt are quite valuable in compiling a comprehensive investigation, these are independent of, and supplementary to, a site inspection." *Id*. at 967. "The potential for controlling the results by controlling the investigator simply is so obvious that we need not dwell on the claim

that Respondent's air sampling reports are a viable alternative to the Union's independent inspection. It is elementary that here, as with the accident investigation, a verifiable, fair, accurate, and complete investigation necessitates the Union having access to conduct its own air monitoring. The need for such live study by the Union is compelling." *Id.* at 968. "The Union is not obligated to rely solely on reports and information obtained by others. It is entitled to its own independent examination of the facilities and this entitlement is unrelated to the Respondent's contention that its own studies and examinations are performed with such accuracy and expertise that no independent verification is required. Such position amounts to an absolute, closed-door policy and renders irrelevant the balancing test that is required to be done. Moreover, it would appear that the circumstances create a presumption not only of relevancy and need, but of access as well." *Id.* at 970.

And finally: "Respondent's final argument [is] that its proprietary interest and the need to protect the secrecy of its operation are paramount to the Union's need for firsthand information and justify exclusion of the Union. Whatever appeal that contention arguably might have, fades in face of the fact that Respondent does not maintain or implement an absolute exclusionary policy in order to assure secrecy of its operations, but indeed invites nonemployees on to its premises. … However, the condition for access that it readily affords to other nonemployees and employees was not tendered to the Union. It appears from that fact alone that Respondent's secrecy argument is disingenuous." *Id.* at 970–71.

Caterpillar counters with *Lechmere, Inc. v. NLRB*, 502 U.S. 527 (1992)—a manifestly inapt reference. The issue was the

right of access to company property of nonemployees who wanted to organize a union of the company's employees. That obviously would have a distracting, perhaps disruptive, effect on the company's operations, and could not be defended by reference to a collective bargaining representative's obligation to bargain for work practices consistent with preserving the health and safety of the bargaining unit's members, because there was as yet no bargaining unit. It's no surprise, therefore, that neither the Labor Board nor any court has applied *Lechmere* to safety and health inspections on behalf of employees represented by a union that has a collective bargaining agreement with their employer.

What could be disruptive of Caterpillar's operations at the Milwaukee plant would be the union's insisting on continuous inspections of the weld shop by members of the emergency response team. But the Board made clear in its opinion that the company need only permit reasonable inspections, properly spaced and timed and so forth.

The company admits and indeed asserts that there must be a balance between the union's interest in protecting the health and safety of the workers whom it represents and the company's interest in avoiding disruptive intrusions on its operations. What it fails to recognize is that after a fatal accident the union has a compelling interest in site access and therefore the company faces a high hurdle in trying to demonstrate that its property interests outweigh the union's need.

Here is a classic image of a balance: Two identical pans are weighed against each other, and one sinks lower because



it contains heavier material. Caterpillar's counsel admits that the "pan" that holds the burden to the company of allowing access to a member of the emergency response team is empty (because there is "no actual harm"), but we know that the "pan" that holds the burden to the union and the workers of being denied access is not empty. The balance thus unequivocally—as Caterpillar's counsel in effect conceded—favors the Labor Board's ruling. He conceded himself out of court.

Since it is apparent that the materials shown Thompson were not an adequate substitute for an on-site investigation, and it is admitted that the investigation would have imposed trivial costs on the company unless the investigation revealed safety problems that were expensive to fix, the challenge to the Board's order has no merit. We therefore enforce the order and deny the company's petition for review.

MANION, *Circuit Judge*, concurring in the judgment.

We must enforce the Board's order and deny Caterpillar's petition for review because both the Board and the ALJ properly balanced the parties' rights under *Holyoke Water Power Co.*, 273 N.L.R.B. 1369 (1985). The ALJ found that the union's right to responsible representation on the issues of health and safety required an onsite inspection and that the materials Caterpillar provided to the union were a poor substitute. Thus, the ALJ found that the union's right to access outweighed Caterpillar's property rights. *Caterpillar Inc.*, 359 N.L.R.B. No. 97 (Apr. 23, 2013). The Board affirmed these findings. 361 N.L.R.B. No. 77 (Oct. 30, 2014). The Board's decision was supported by substantial evidence and its legal conclusions have a reasonable basis in law. *See Sears, Roebuck & Co. v. NLRB*, 349 F.3d 493, 502 (7th Cir. 2003).

The balance weighed is between the parties' respective rights, not the harms or burdens. *Ante* at 8; *cf. ante* at 12–13. To determine whose right prevails, the Board balances the company's property rights, which include the right to exclude others, against the union's right to responsible representation, which requires information on health and safety conditions. In so doing, the Board must consider whether the union's needs can be met by alternate means other than entering the employer's premises. *Holyoke Water Power*, 273 N.L.R.B. at 1370.

The Supreme Court has recognized that "[o]rganization rights are granted to workers by the same authority, the National Government, that preserves property rights," and that employers have the "right to exclude from property." *N.L.R.B. v. Babcock & Wilcox Co.*, 351 U.S. 105, 112 (1956). Caterpillar's lack of an "actual harm" from Thompson's inspection does

not render its side of the scale empty. Caterpillar still retains the right to exclude others from its property. The lack of harm, however, shows in this case that Caterpillar's property rights can be sufficiently accommodated even if it is forced to allow union access.

That said, even union access that results in "no actual harm" still infringes on an employer's property rights, requiring the Board to determine whether the union has an actual need for access. This was the point of Caterpillar's reference to a leaky faucet. Caterpillar did not analogize the accident investigation sought by the union to an investigation of a leaky faucet to trivialize the unfortunate man's death. *See ante* at 2. Rather, Caterpillar stressed that access must be granted only where alternative means are insufficient:

> The severity—indeed, the tragedy—of the accident is not in dispute. But, the touchstone of the *Holyoke* standard is not the relative severity of the accident that precipitated the Union's demand for access, it is the necessity of access as the only means of carrying out the union's representational function. Again, that the Union may seek access for a legitimate representational purpose is only the threshold question in the analysis. *Holyoke*, 273 NLRB at 1370. The critical inquiry is whether access is required in order for the union to undertake its investigation. *Id*. If not, the employer's competing property interests prevail, whether the underlying issue that the union seeks to investigate [is] an industrial accident or a leaky faucet.

Appellant Br. 31. While "a leaky faucet" is perhaps not the best comparison, the Board used the same comparison during oral argument to explain why the relevance of the information sought from an investigation must be established before *Holyoke's* balancing test is applied. The Board did so to explain why the ALJ discussed information cases when the union sought access.

The ALJ found, by substantial evidence, that the alternative means to investigate were insufficient, so the union required access. It is the union's need for access, rooted in the employees' right to responsible representation, that weighs heavier on the scale than Caterpillar's property rights. Whatever benefit the union derives from demonstrating to its members that it is not impotent is not weighed in the balance.[1] *See ante* at 8. The right to responsible representation does not include the right to flex union muscle.

---

[1] Although we cannot exclude the possibility that Caterpillar refused access to Thompson to prevent the union from "perhaps discovering negligence" or "to demonstrate to its employees that the union can do nothing to enhance their safety," *ante* at 8, there is no evidence in the record to suggest that it was so.